ECKER et al., CONSTITUTING INSTITUTIONAL BONDHOLDERS COMMITTEE, *v.* WESTERN PACIFIC RAILROAD CORP. et al.*

No. 7. Argued October 13, 14, 1942.—Decided March 15, 1943.

*Together with No. 8, *Crocker First National Bank et al., Trustees,* v. *Western Pacific Railroad Corp. et al.;* No. 20, *Western Pacific Railroad Co.* v. *Ecker et al.;* No. 33, *Reconstruction Finance Corp.* v. *Western Pacific Railroad Corp. et al.;* and No. 61, *Irving Trust Co., Substituted Trustee,* v. *Crocker First National Bank et al.,* also on writs of certiorari, 316 U. S. 654, to the Circuit Court of Appeals for the Ninth Circuit.

450

*Mr. Robert T. Swaine,* with whom *Messrs. Herbert W. Clark* and *Benjamin R. Shute* were on the briefs, for the Institutional Bondholders Committee, petitioner in No. 7 and respondent in Nos. 8, 20, 33, and 61. *Mr. Russell L. Snodgrass,* with whom *Solicitor General Fahy* and *Mr. Emmet McCaffery* were on the brief, for petitioner in No. 33. *Mr. Orville W. Wood,* with whom *Mr. Arthur A. Gammell* was on the briefs, for Crocker First National Bank et al., Trustees of First Mortgage, petitioners in No. 8 and respondents in Nos. 7, 20, 33, and 61. *Mr. Frank C. Nicodemus, Jr.,* filed a brief on behalf of the Western Pacific R. Co., petitioner in No. 20 and respondent in Nos. 7, 8, 33, and 61. *Mr. H. C. McCollom,* with

whom *Mr. Orrin G. Judd* was on the briefs, for the Irving Trust Co., Trustee of General Refunding Mortgage, petitioner in No. 61 and respondent in Nos. 7, 8, 20, and 33.

*Mr. M. C. Sloss* for the Western Pacific Railroad Corporation; *Mr. Robert E. Coulson*, with whom *Mr. Horace E. Whiteside* was on the brief, for A. C. James Co.; and *Mr. Edward G. Buckland*, with whom *Mr. William J. Kane* was on the brief, for the Railroad Credit Corporation,—respondents.

*Solicitor General Fahy* and *Messrs. Daniel W. Knowlton* and *Daniel H. Kunkel* filed a brief on behalf of the Interstate Commerce Commission as *amicus curiae*, urging reversal.

MR. JUSTICE REED delivered the opinion of the Court.

Petitioners seek review of a decree of the Circuit Court of Appeals in the reorganization of the Western Pacific Railroad Company under § 77 of the Bankruptcy Act. That decree reversed the order of the District Court which had approved the plan for reorganization certified to it by the Interstate Commerce Commission.[1]

The petitions for certiorari ask adjudication of questions which are important in the field of railroad reorganization. They involve the respective function of Commission and court, the method of valuation of railroad property by the Commission, the legality of the exclusion of stockholders and certain creditors from participation in the estate, a more favorable participation of a Reconstruction Finance Corporation claim because of new money furnished for the plan, allocation of securities

---

[1] Sec. 77, Bankruptcy Act, Reorganization of Railroads, 47 Stat. 1474, as amended, 11 U. S. C. § 205; *In re Western Pacific R. Co.*, 124 F. 2d 136; *In re Western Pacific R. Co.*, 34 F. Supp. 493; Western Pacific R. Co. Reorganization, 230 I. C. C. 61; 233 I. C. C. 409; 236 I. C. C. 1.

among claimants, priorities of liens created by different mortgages and subsidiary issues. Heretofore this Court has not passed upon them. For their determination we granted certiorari. 316 U. S. 654.

The debtor railroad company filed its petition in the District Court for the Northern District of California on August 2, 1935, alleging its inability to pay and discharge its indebtedness as it matured and praying for reorganization under § 77. The petition was approved as properly filed, trustees were appointed, their appointment ratified, 207 I. C. C. 793, and the appropriate steps taken to bring the plan of reorganization before the Commission for consideration. Public hearings were held by the Commission at which other plans for reorganization were filed, one by a group of bondholders known as the Institutional Bondholders Committee and one by the A. C. James Company, a secured creditor of the debtor which also was financially interested in the treatment accorded the preferred and common stock of the debtor. After full consideration of the problems of the debtor's reorganization and after the development of a plan deemed in accordance with § 77, the Commission certified its plan to the District Court on September 28, 1939.

The Commission's conclusions and orders were reached upon exceptions to the report of its Bureau of Finance. Its plan was the outgrowth of a study of the financial condition and economic situation of the debtor, viewed in the setting of the public interest in a national transportation system. The competing claims of the various classes of creditors and stockholders were appraised in the light of the requirements of the Act that they be accorded fair and equitable treatment. There is little if any dispute concerning the primary facts from which factual or legal inferences are to be drawn.

The debtor is a California corporation with its principal operating office in San Francisco. It carries on an interstate railroad business between the States of California,

Nevada and Utah.[2]   For an understanding of this opinion
the obligations of the debtor as of January 1, 1939, the

[2] The summary of the debtor's property prepared by the Interstate
Commerce Commission as of October 10, 1938, 230 I. C. C. 62,
follows:

"*Location and general description of the property*.—The debtor owns
or operates a total of 1,207.51 miles of standard-gage steam railroad.
The main lines extend eastward 924.17 miles from Oakland, Calif., to
Salt Lake City, Utah, and northward 111.81 miles from Keddie to
Bieber, Calif., with operating rights over the Great Northern Railway,
46.38 miles, from Bieber to Hambone, Calif.   The debtor also operates
4.2 miles of ferry service from Oakland to San Francisco, and 185.3 miles
of second main track, of which 182.91 miles between Weso and Alazon,
Nev., are owned by the Southern Pacific.   This territory is known as
the 'paired-track district,' since the two lines are used as a double-track
railroad by both companies.   Various branch lines springing from the
Oakland-Salt Lake City line are as follows:

|  | *Miles* |
|---|---|
| Niles Junction to San Jose, Calif. | 23.07 |
| Calpine Junction to Calpine, Calif. | 12.62 |
| Hawley to Loyalton, Calif. | 12.79 |
| Reno Junction, Calif., to Reno, Nev. | 33.11 |
| Burmester to Warner, Utah. | 15.52 |
| Miscellaneous | 21.79 |
| Total | 118.90 |

"*Owned or controlled and jointly affiliated railroad companies*.—The
debtor owns all the outstanding capital stock of the Sacramento North-
ern Railway, an electrically operated standard-gage freight and pas-
senger railroad, consisting of 276.2 miles of road serving and connecting
San Francisco and Oakland with various Sacramento Valley cities,
principally Pittsburg, Vacaville, Sacramento, Woodland, Marysville,
Colusa, and Oroville, all in California.

"By ownership of more than 99 percent of the outstanding capital
stock, the debtor controls the Tidewater Southern Railway, which
operates a standard-gage steam freight line 61.38 miles in length,
connecting Stockton with Manteca, Escalon, Modesto, and Turlock
in the San Joaquin Valley of California.

"The debtor owns all the outstanding capital stock of the Deep Creek
Railroad Company, which owns and operates a standard-gage steam
railroad extending from Wendover to Gold Hill, Nev., a distance of

date proposed for the beginning of the operation of the plan, may be stated as follows:

| Claim or Interest | Principal of claim or interest | Accrued interest at contract rate to effective date of plan | Total claim including interest at contract rate to effective date of plan |
|---|---|---|---|
| Trustees' Certificates (held by Reconstruction Finance Corporation) | $10,000,000.00 | $ | $10,000,000.00 |
| Equipment obligations | 2,750,050.00 | 94,202.00 | 2,844,252.00 |
| First Mortgage 5% Bonds | 49,290,100.00 | 13,143,776.66 | 62,433,876.66 |
| Reconstruction Finance Corporation Collateral Notes (secured by $10,750,000 General and Refunding Mortgage bonds and other collateral*) | 2,963,000.00 | 899,869.98 | 3,862,869.98 |
| The Railroad Credit Corporation Collateral Notes (secured by $4,000,000 General and Refunding Mortgage bonds and other collateral*) | 2,445,609.88 | 145,314.23 | 2,590,924.11 |
| A. O. James Co. Collateral Notes (secured by $4,249,500 General and Refunding Mortgage bonds) | 4,999,800.00 | 1,249,950.00 | 6,249,750.00 |
| Total secured debt | $72,448,559.88 | $15,533,112.87 | $87,981,672.75 |
| Unsecured Claims | 5,818,791.00 | | |
| Preferred Stock | 28,300,000.00 | | |
| Common Stock | 47,500,000.00 | | |
| | $154,067,350.88 | | |

*The "other collateral" does not belong to the debtor and is unaffected by the plan. See p. 503, *infra*.

Payment of this indebtedness was secured by liens, collateral or priority, as follows:

The trustees' certificates of $10,000,000 are secured by a lien on the entire estate and priority over all claims beyond reorganization expenses.

44.6 miles. In addition it owns 50 percent of the capital stock of the Salt Lake City Union Depot & Railroad Company; 33⅓ percent of the capital stock of the Central California Traction Company, operating an electrically operated freight railroad extending from Stockton to Sacramento, Calif., with a road mileage of 53.78 miles; and 50 percent of the capital stock of the Alameda Belt Line, operating 15.86 miles of terminal switching line in the city of Alameda on San Francisco Bay.

"None of the above subsidiary or affiliated companies has filed a petition under section 77 of the Bankruptcy Act, as amended."

The equipment obligations of $2,750,050 are secured by rolling stock, acquired free of the liens of mortgages, through direct liens or trust arrangements. No one disputes the sound character of any of these securities. They are given priority over the fixed obligations of the reorganized company.

Subject to the trustees' certificates and equipment obligations, the first mortgage 5% bonds of $62,433,876.66, face and interest to the effective date of the plan, are secured ·by prior liens on all valuable property of the debtor, except (1) money, accounts, operating balances and cash items, and (2) certain assets, referred to in the next paragraph, upon which the general and refunding bonds have a first lien, deemed by the Commission to be of value sufficient to support $732,010 of new income mortgage bonds and new preferred stock of $1,147,955 par. The total face and assumed value of the securities authorized by the plan, as evidence of the entire value of the system, is $84,000,000 plus. See p. 481, *infra*. This paragraph reflects our conclusions as to priorities of the liens of the respective mortgages later discussed. See *Priorities of Conflicting Liens*, p. 489, *infra*.

The later general and refunding mortgage bonds, $18,999,500 in face amount, are secured by a first lien on properties determined by the Commission to be of a value and earning power sufficient to support issues of new income bonds and participating preferred stock of $732,010 and $1,147,955, respectively. See 233 I. C. C. 414 *et seq.* They are further secured, subject to the prior rights and other exceptions of the obligations listed in the preceding paragraphs, by a lien on all valuable property of the debtor. All of this series which were issued are pledged to secure the collateral notes in the amounts indicated in the preceding table.

By reason of an arrangement with the Reconstruction Finance Corporation, detailed later in the section of this

opinion headed *Allocation of Securities*, B, p. 485, *infra*, the distribution of securities to creditors did not reflect absolutely their priority position. The collateral notes owned by the R. F. C. were treated in the distribution of securities on the same basis as were the claims of old First bondholders. The result is summarized by the table on page 461 and footnotes 5 and 6.

By stipulation of the parties, the record shows that the value of the property of the debtor and its subsidiaries, "as found by the Interstate Commerce Commission under Section 19 (a) of the Interstate Commerce Act, with additions and betterments, new lines and extensions, subsequent to date of valuation, plus non-operating properties," was $150,907,623.49 as of December 31, 1938. It is further stipulated that there is no deferred maintenance in the debtor's properties. "Its facilities and equipment are sufficient to handle expeditiously and efficiently all traffic reasonably to be anticipated in the immediate future." The value of the debtor's system, with equipment depreciated, was $144,978,559 as of December 31, 1938.

There is agreement as to the amount of system earnings available for interest for 1922 to 1939, inclusive. The amounts follow: [3]

*Adjusted Consolidated Earnings Available for Interest*

| | | |
|---|---|---|
| 1922 — $2, 404, 890 | 1928 — $4, 376, 972 | 1934 — $1, 396, 353 |
| 1923 — 3, 412, 234 | 1929 — 3, 718, 436 | 1935 — 1, 377, 026 |
| 1924 — 3, 241, 823 | 1930 — 2, 381, 529 | 1936 — 1, 901, 423 |
| 1925 — 4, 557, 798 | 1931 — 220, 494 (deficit) | 1937 — 1, 077, 407 |
| 1926 — 4, 868, 390 | 1932 — . 283, 912 | 1938 — 225, 431 |
| 1927 — 3, 470, 861 | 1933 — 474, 365 | 1939 — 1, 519, 916 |

It is to be borne in mind that while these figures represent net income of the system, as shown by its combined income account, adjusted as indicated, factors other than

---

[3] These figures represent reported consolidated earnings "adjusted to take into account (a) rehabilitation expenditures in the years 1927–1931 and 1934–1938, (b) amortization of discount on First Mortgage Bonds of the Debtor in the years 1922–1938, and (c) deductions and credits in the years 1931–1934 made by the Commission to accord with its Accounting Rules and Regulations, . . ."

the net income result were placed before and weighed by the Commission and the District Court. Of course the fluctuating operating revenues for the periods from freight, passenger, mail, express, victualing and miscellaneous were considered, as well as the corresponding labor, power, tax, rental and miscellaneous expenses. Operating ratio percentages for the various years are available in the evidence.

The stipulated operating revenues of the debtor's system for the years 1922–1938 and the first nine months of 1939 are as follows:

| | | |
|---|---|---|
| 1922............$12,736,564 | 1928............$19,421,851 | 1934............$13,779,238 |
| 1923............ 14,414,812 | 1929............ 20,096,557 | 1935............ 14,407,458 |
| 1924............ 14,669,313 | 1930............ 18,819,062 | 1936............ 16,547,344 |
| 1925............ 15,898,548 | 1931............ 14,852,938 | 1937............ 17,918,485 |
| 1926............ 17,951,468 | 1932............ 12,251,071 | 1938............ 16,057,451 |
| 1927............ 18,306,675 | 1933............ 12,202,489 | 1939 (1st 9 mths.)... 12,836,985 |

Furthermore, the record shows the favorable effect upon the system's gross operating revenue of the extension of its lines into Northern California. This new construction, known as the Northern California Extension, was put into operation in 1932 and contributed the following gross revenues from freight originating, terminating and passing over the extension:

| | |
|---|---|
| 1932............$1,098,016 | 1936............$3,151,734 |
| 1933............ 1,491,466 | 1937............ 3,425,601 |
| 1934............ 2,119,427 | 1938............ 3,093,676 |
| 1935............ 2,289,858 | 1939 (first 9 months)............ 2,463,484 |

The extension is a link in a Pacific coast route created by this northerly extension and a corresponding southerly extension by the Great Northern Railroad Company which join at Bieber, California. The extension cost over ten million dollars and was built with the expectation, since realized, of materially increasing the value of the debtor's property as an operating road. The Commission gave consideration to this factor in estimating the probabilities of future income.

Prospects for maintaining and increasing the debtor's traffic and so its net for interest and dividends are influenced by the fact that it depends to a considerable extent

upon traffic arrangements with other lines. The debtor's main line from Oakland, California, to Salt Lake City is an important section of a through route from the Pacific coast to the Midwest. In conjunction with the Denver & Rio Grande Western and the Missouri Pacific Railroad Company it offers fast through schedules. The Denver & Rio Grande Western completed, in 1934, the Dotsero Cut-off. This cutoff and the Moffatt Tunnel, a nearby improvement of the Denver and Salt Lake, used together materially shorten the railroad distance between Pacific coast and Midwest points and open to passenger traffic a scenic route of great beauty. The hearings on reorganization make these facts as to the likelihood of increased traffic available to the Commission and court.

These basic factors of physical condition, traffic, gross and net income et cetera were before the Commission and the courts. From them there was to be projected an estimate as to the future from which was to be drawn a present valuation of the property and its ability to carry by its earnings a certain volume in dollars of securities. There are no assets of significant worth which are not in active use as producers of income. Relying largely upon past earnings, the Commission found "that the fixed interest charges of the reorganized company should not initially and substantially exceed $500,000, if the reorganized company is to maintain its property properly and secure necessary new capital in the future." It further determined that the plan should provide a capital fund for future routine additions and betterments. This was estimated to require $500,000 annually.[4] Carrying charges of $94,202 on existing equipment trusts were to be assumed

[4] 230 I. C. C. 91: "Annual payments into the fund should be $500,000 or such lesser sum as may be required, together with unappropriated accumulations in the fund as of the close of the calendar year prior to that for which the payment is to be computed, less charges for additions and betterments during the latter year, to bring the total in the fund to $1,000,000."

by the reorganized corporation. A new $10,000,000 first mortgage 4% bond issue was allotted $400,000 annually. These fixed charges aggregate $994,202. In addition to the fixed charges, the Commission determined the system reasonably could carry another $1,000,000 of contingent charges. Thus the over-all charge for annual fixed and contingent interest, capital and sinking funds was limited to approximately $2,000,000 per annum. Income mortgage 4½% bonds were authorized in the amount of $21,219,075. Their annual interest comes to $954,858 and their one-half per cent sinking fund calls for $106,095.

In view of the foregoing limitation, capitalization of the reorganized company was fixed at $2,750,050 of undisturbed equipment obligations, $10,000,000 of first mortgage 4% bonds, $21,219,075 of income mortgage 4½% bonds, $31,850,297 of 5% preferred stock, and 319,441 shares of common stock without par value.[5] These issues

[5] 233 I. C. C. 409, 413; 236 I. C. C. 1, 4. This is summarized by a petitioner as follows:

| Title of Issue | Presently to be issued | Annual Charges |
|---|---|---|
| Undisturbed existing equipment obligations | $2,750,050 | $94,202 |
| First Mortgage 4% Bonds, Series A, due January 1, 1974 | 10,000,000 | 400,000 |
| Total annual fixed charges | | $494,202 |
| Mandatory Capital Fund | | 500,000 |
| Income Mortgage 4½% Bonds, Series A, due January 1, 2014. Interest cumulative to 13½%, otherwise noncumulative. Convertible at the option of the holder into new Common Stock at the price of $50 per share | 21,219,075 | 954,858 |
| Total funded debt | $33,969,125 | |
| Total annual charges (fixed and contingent) and Capital Fund | | $1,949,060 |
| Income Mortgage Sinking Fund (½%) | | 106,095 |
| Participating 5% Preferred Stock ($100 par value) | 31,850,297 | 1,592,515 |
| Total securities with par value | $65,819,422 | |
| Total annual charges, Capital Fund, and Preferred dividend requirements | | $3,647,670 |
| Common Stock (without par value) | 319,441 shs. | |

of preferred and common were based upon possible earnings in addition to the $2,000,000 plus. These securities were allotted by the Commission upon consideration of "the relative priority, value, and equity of the various claims and the value of the new securities available in exchange therefor," as follows: [6]

| | New First Mortgage 4% Bonds Series A | New Income Mortgage 4½% Bonds Series A | New 5% preferred Stock Series A ($100 Par) | New Common Stock (No Par) |
|---|---|---|---|---|
| First Mortgage 5% Bonds ($62,433,876.66) | ------------ | $19,716,040 | $29,574,060 | 230,593 shs. |
| RFC (In exchange for Trustees' Certificates of $10,000,000 and Collateral Notes of $3,862,869.98) | $10,000,000 | 1,185,200 | 1,777,800 | 15,788 shs. |
| RCO Collateral Notes ($2,590,924.11) | ------------ | 154,111 | 241,681 | 35,425 shs. |
| ACJ Collateral Notes ($6,249,750) | ------------ | 163,724 | 256,756 | 37,635 shs. |
| Totals | $10,000,000 | $21,219,075 | $31,850,297 | 319,441 shs. |

[6] The applicable portion of the finding is as follows:

"(1) First-mortgage bondholders, $19,716,040 of income-mortgage bonds, $29,574,060 of preferred stock, and 230,593 shares of common stock, the common stock to be taken at the price of $57 a share; (2) Finance Corporation, $1,185,200 of income-mortgage bonds, $1,777,-800 of preferred stock, and 15,788 shares of common stock, the common stock to be taken at a price of $57 a share; (3) Credit Corporation, $154,111 of income-mortgage bonds, $241,681 of preferred stock, and 35,425 shares of common stock, the common stock to be taken at a price of $62 a share; and (4) James Company, $163,724 of income-mortgage bonds, $256,756 of preferred stock, and 37,635 shares of common stock, being the amount of common stock which bears to the amount of common stock allotted to the claim of the Credit Corporation the same proportion that the principal amount of general and refunding bonds of the debtor held by the James Company as collateral for its claim bears to the principal amount of such bonds held by the Credit Corporation for its claim." The result of the distribution per dollar of indebtedness is set out in the Commission's reports. 230 I. C. C. 101 and 233 I. C. C. 417 and 451.

The Commission found, correlative to and as a basis for its allocation of securities, that "the equity of the existing stock has no value, and hence holders of such stock are not entitled to participate in the plan. Further, considering that the reorganized company's income available for interest and dividends must total $4,318,035,[*] plus any undistributed profits tax that will be payable, before dividends of $3 per share may be paid on the new common stock, it is clear that, even though all the securities remaining available for distribution after satisfying the claims of the first-mortgage bondholders are allotted to the other secured creditors, such securities will be inadequate in value to satisfy their claims. For this reason, and for the reasons stated with respect to the finding that the equity of the existing stock has no value, we find that the claims of the unsecured creditors, of the Western Pacific Railroad Corporation, and of the Western Realty Company, have no value, and hence no securities or cash should be distributed under the plan in respect of those claims." 230 I. C. C. 101.

The plan and a transcript of the proceedings before the Commission were duly certified to the District Court. *In re Western Pacific R. Co.*, 34 F. Supp. 493, 495. The plan in complete form and a detailed discussion of the history, property and business prospects of the debtor appear in the various reports of the Commission and the opinion below. See note 1 *supra*. The District Court heard the protests against the action of the Commission and the additional evidence offered, and found that the plan conformed in all respects to the requirements of § 77.[7] All

---

*This amount now is somewhat larger on account of increased face of securities. 233 I. C. C. at 412.

[7] For the purposes of this controversy, the apposite requirements of § 77, 11 U. S. C. § 205, may be excerpted as follows:

"(b) A plan of reorganization within the meaning of this section (1) shall include provisions modifying or altering the rights of credi-

objections to the plan were therefore overruled and the court directed that a copy of the order and opinion be transmitted to the Commission for use in submitting the plan for action to the first mortgage bondholders, the R. F. C., the A. C. James Co. and the Railroad Credit Corporation, the only creditors found to be entitled to vote on the adoption of the plan.

On appeal to the Circuit Court of Appeals, Judicial Code § 128, 43 Stat. 936, this order was reversed. The court

tors generally, or of any class of them, secured or unsecured, either through the issuance of new securities of any character or otherwise; (2) may include provisions modifying or altering the rights of stockholders generally, or of any class of them, either through the issuance of new securities of any character, or otherwise; (3) may include, for the purpose of preserving such interests of creditors and stockholders as are not otherwise provided for, provisions for the issuance to any such creditor or stockholder of options or warrants to receive, or to subscribe for, securities of the reorganized company in such amounts and upon such terms and conditions as may be set forth in the plan; (4) shall provide for fixed charges (including fixed interest on funded debt, interest on unfunded debt, amortization of discount on funded debt, and rent for leased railroads) in such an amount that, after due consideration of the probable prospective earnings of the property in light of its earnings experience and all other relevant facts, there shall be adequate coverage of such fixed charges by the probable earnings available for the payment thereof; (5) shall provide adequate means for the execution of the plan, . . .

. . . . .

"(d) The debtor, after a petition is filed as provided in subsection (a) of this section, shall file a plan of reorganization within six months of the entry of the order by the judge approving the petition as properly filed, . . . After the filing of such a plan, the Commission, unless such plan shall be considered by it to be prima facie impracticable, shall, after due notice to all stockholders and creditors given in such manner as it shall determine, hold public hearings, at which opportunity shall be given to any interested party to be heard, and following which the Commission shall render a report and order in which it shall approve a plan, which may be different from any which has been proposed, that will in its opinion meet with the requirements of sub-

rested upon the necessity of specific valuation of the entire property, of the respective portions of it covered by the First Mortgage and the Refunding Mortgage, of each of the claims and of the new securities allocated to the creditors. Such action was deemed essential to

sections (b) and (e) of this section, and will be compatible with the public interest; or it shall render a report and order in which it shall refuse to approve any plan. In such report the Commission shall state fully the reasons for its conclusions.

" . . . No plan shall be approved or confirmed by the judge in any proceeding under this section unless the plan shall first have been approved by the Commission and certified to the court. . . .

"(e) Upon the certification of a plan by the Commission to the court, the court shall give due notice to all parties in interest of the time within which such parties may file with the court their objections to such plan, and such parties shall file, within such time as may be fixed in said notice, detailed and specific objections in writing to the plan and their claims for equitable treatment. The judge shall, after notice in such manner as he may determine to the debtor, its trustee or trustees, stockholders, creditors, and the Commission, hear all parties in interest in support of, and in opposition to, such objections to the plan and such claims for equitable treatment. After such hearing, and without any hearing if no objections are filed, the judge shall approve the plan if satisfied that: (1) It complies with the provisions of subsection (b) of this section, is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders; . . .

"If the judge shall not approve the plan, he shall file an opinion, stating his conclusions and the reason therefor, and he shall enter an order in which he may either dismiss the proceedings, or in his discretion and on motion of any party in interest refer the proceedings back to the Commission for further action, in which event he shall transmit to the Commission a copy of any evidence received. . . . If the judge shall approve the plan, he shall file an opinion, stating his conclusions and the reasons therefor, and enter an order to that effect, and shall send a certified copy of such opinion and order to the Commission. The plan shall then be submitted by the Commission to the

enable the District Court to exercise its independent judgment upon matters of valuation and allocation. The failure to make such separate valuations was held to require the setting aside of the District Court's approval of the plan. See note 26, *infra*.

creditors of each class whose claims have been filed and allowed in accordance with the requirements of subsection (c) of this section, and to the stockholders of each class, and/or to the committees or other representatives thereof, for acceptance or rejection, within such time as the Commission shall specify, together with the report or reports of the Commission thereon or such a summarization thereof as the Commission may approve, and the opinion and order of the judge: *Provided,* That submission to any class of stockholders shall not be necessary if the Commission shall have found, and the judge shall have affirmed the finding, (a) that at the time of the finding the corporation is insolvent, or that at the time of the finding the equity of such class of stockholders has no value, or that the plan provides for the payment in cash to such class of stockholders of an amount not less than the value of their equity, if any, . . . *Provided further,* That submission to any class of creditors shall not be necessary if the Commission shall have found, and the judge shall have affirmed the finding, that the interests of such class of creditors will not be adversely and materially affected by the plan, or that at the time of the finding the interests of such class of creditors have no value, or that the plan provides for the payment in cash to such class of creditors of an amount not less than the value of their interests. . . .

. . . . .

"If it shall be necessary to determine the value of any property for any purpose under this section, the Commission shall determine such value and certify the same to the court in its report on the plan. The value of any property used in railroad operation shall be determined on a basis which will give due consideration to the earning power of the property, past, present, and prospective, and all other relevant facts. In determining such value only such effect shall be given to the present cost of reproduction new and less depreciation and original cost of the property, and the actual investment therein, as may be required under the law of the land, in light of its earning power and all other relevant facts.

"(f) . . . The property dealt with by the plan, when transferred and conveyed to the debtor or to the other corporation or corporations

*Function of the Court.* The conclusion of the Court of Appeals as to the necessity for a detailed valuation springs from its interpretation of the statute as to the function of the District Court in reorganizations. That court had said in its opinion:

"It cannot be gainsaid that the Commission knows all about the Debtor, its property, its history, financial and otherwise, its traffic and revenue, and its financial structure. No official body in the country is better qualified, by reason of experience, ability and specialized knowledge than is the Commission to find the ultimate facts as to the Debtor in relation to any of the matters mentioned." *In re Western Pacific R. Co.,* 34 F. Supp. 493, 501.

Commenting upon this, the Court of Appeals said:

"The statement indicates a possible misconception. . . .

"In determining whether a plan of reorganization satisfies the requirements of subsection e, the court is not concluded by any determination made by the Commission, but may, and must, exercise its own independent judgment; and this is true whether such determination relates to value or to some other subject. Initially, however, the duty of determining the value of any property for any purpose under § 77 rests on the Commission, not

provided for by the plan, or when retained by the debtor pursuant to the plan, shall be free and clear of all claims of the debtor, its stockholders and creditors, and the debtor shall be discharged from its debts and liabilities, except such as may consistently with the provisions of the plan be reserved in the order confirming the plan or directing such transfer and conveyance or retention, and the judge may require the trustee or trustees appointed hereunder, the debtor, any mortgagee, the trustee of any obligation of the debtor, and all other proper and necessary parties, to make any such transfer or conveyance, and may require the debtor to join in any such transfer or conveyance made by the trustee or trustees. . . ."

on the court." *In re Western Pacific R. Co.,* 124 F. 2d 136, 140.

Petitioners in Nos. 7, 8 and 33 seek review of this last ruling. Their petitions for certiorari query whether § 77 does not vest

"in the Commission exclusive jurisdiction (subject only to review for arbitrary exercise) to determine whether a railroad reorganization plan is 'compatible with the public interest,' including jurisdiction to determine total capitalization, the classification thereof, and the financial details of each class of proposed capitalization?"

This summary sufficiently identifies the issue without the necessity of elaborating differentiations in the petitioners' present views or of determining the degree of difference between the views of the district and appellate courts as to the function of the court under § 77.

The opinion shows the attitude of the District Court, 34 F. Supp. 493, 503, 504: "The capitalization permitted by these earnings is a mere matter of computation, which will demonstrate that the Commission did not act arbitrarily in limiting capitalization nor the respective classes thereof. . . .

"The determination of the amount and character of the capitalization (a legislative function affecting the public interest) is exclusively within the province of the Commission. The only qualification, if any, is that the court shall independently determine whether, in the exercise of its jurisdiction, the Commission has acted fairly, within the bounds of the Constitution, and not arbitrarily." Upon the other findings of the Commission, the District Court exercised an independent judgment based upon the record and the findings of the Commission together with additional evidence produced before the court by the parties. 34 F. Supp. 493, 505.

These reorganizations require something more than contests between adversary interests to produce plans which are fair and in the public interest. When the public interest, as distinguished from private, bulks large in the problem, the solution is largely a function of the legislative and administrative agencies of government with their facilities and experience in investigating all aspects of the problem and appraising the general interest.[8] Congress outlined the course reorganization is to follow. It established standards for administration and placed in the hands of the Commission the primary responsibility for the development of a suitable plan. When examined to learn the purpose of its enactment, § 77 manifests the intention of Congress to place reorganization under the leadership of the Commission, subject to a degree of participation by the court.

It is clear from the discussions and the statute itself that there was recognition by everyone of the advantages of utilizing the facilities of the Commission for investigation into the many-sided problems of transportation service, finance and public interest involved in even minor railroad reorganizations and utilizing the Commission's experience in these fields for the appraisals of values and the development of a plan of reorganization, fair to the public, creditors and stockholders.[9] The resulting legislation was an attempted balance between the power of the Commission and that of the court.

As to the court's place in reorganization, the present statute does not vary greatly from the first legislative ef-

---

[8] Cf. Hearings on H. R. 7432, House Committee on Interstate and Foreign Commerce, 72d Cong., 2d Sess. (1933), pp. 11–12; Cushman, The Independent Regulatory Commissions (1941) 45–58.

[9] The need for railroad rehabilitation legislation under the bankruptcy clause of the Constitution was generally recognized. President's Message, January 11, 1933, 76 Cong. Rec. 1615; 46th Annual Report of the I. C. C., Dec. 1, 1932, p. 15; for a statement that the President-elect favored the legislation, see 76 Cong. Rec. 2917.

fort, enacted March 3, 1933, to reorganize railroads unable to meet their obligations.[10] The amendments of 1935 were primarily designed to cure defects disclosed by practical experience.[11] Both acts are bottomed upon the theory of debtor rehabilitation by adjustment of creditors' claims. Such treatment was essential for embarrassed railroads, as ordinary bankruptcy liquidation or judicial sales were impossible because of the size of their indebtedness and the paucity of buyers. The acts were a part of the relief granted financially involved corporations, public and private, in the depression years of the early thirties.[12] Since railroads could not take advantage of the Bankruptcy Act, § 4, 11 U. S. C. § 22, their financial adjustments for years had been carried out in equity receiverships under judicial control. These were cumbersome, costly and privately managed with inadequate consideration for the public interest in a soundly financed transportation system. Chicago, M. & St. P. Investigation, 131 I. C. C. 615, 671; *United States* v. *Chicago, M., St. P. & P. R. Co.*, 282 U. S. 311, 331 dissent.

The first bill was introduced in the House January 21, 1933, as H. R. 14359.[13] It was drafted so as to place "the entire plan of reorganization under the jurisdiction, supervision and control" of the Commission. After Commission approval, which followed stockholder and creditor approval, it was to transmit the "approved plan, its findings and the record to the court. The court's review must

---

[10] The section was extensively revised in 1935. Compare 47 Stat. 1474 with 49 Stat. 911.

[11] H. Rep. No. 1283, 74th Cong., 1st Sess., p. 1; S. Rep. No. 1336, 74th Cong., 1st Sess., p. 1.

[12] For the twelve months ending Sept. 30, 1932, operating revenues of Class I railroads were $3,321,052,031, a decline of $915,535,318 below those of the calendar year 1931 and about equal to those of the year 1915. 46th Annual Report of the Interstate Commerce Commission, Dec. 1, 1932, p. 6. Cf. 48 Stat. 912, 798.

[13] 76 Cong. Rec. 2905.

be based upon the record made before the Commission." [14] This substitution of the Commission for an equity receivership under court direction was criticized and amendments suggested to "eliminate all confusion in regard to the functions to be exercised by the commission and by the court, . . . and [to] remove the most fundamental objections to the bill in its present form." [15] Notwithstanding the criticism the bill passed the House with the power lodged in the Commission, as originally proposed. When the House bill for the relief of debtors [16] was reported by the Senate Committee, the railroad section was omitted. By a motion from the floor it was reinstated but in a changed form. The Senate adopted changes designed to give more power to the court. 76 Cong. Rec. 4907, 5104–34. Hearings before the court were provided. The judge, it was added, was to be "satisfied that (1) the approved plan complies with the provisions of subsection (b) of this section, is equitable and does not discriminate unfairly in favor of any class of creditors or stockholders." [17] These amendments giving concurrent powers to the court were adopted by the Senate and accepted by the House and the bill became the Act of March 3, 1933, 47 Stat. 1474.

Following the recommendation of the President in his message of June 7, 1935, the Congress adopted amendments to the 1933 Act which were in line with the suggestions of the Federal Coordinator of Transportation

---

[14] H. Rep. No. 1897, 72d Cong., 2d Sess., pp. 6–7. Subsections (d) and (g), H. R. 14359, 76 Cong. Rec. 2905, 2906.

[15] Solicitor General's Memorandum, 76 Cong. Rec. 2771, 2773.

[16] The bill dealt with the subject matter of what are now Chapters 8–11 of the Bankruptcy Act.

[17] Subsection (g), 47 Stat. 1479. The provisions of subsection (b) were then substantially like they are now.

and the Commission.[18]  While the most important amendment was to furnish means to avoid the obstruction of dissatisfied classes of creditors or stockholders by making a fair and equitable plan effective over dissenters, the requirement of coördinated action by Commission and court was retained.

The Senate Report, No. 1336, 74th Cong., 1st Sess., concluded:

"The amendments to section 77 leave unimpaired the power and the duty of the commission and the courts to deal with the most important feature of all reorganization plans, that of the control of the reorganized company; and similarly the commission and courts will continue to have the power and authority of making that thorough investigation which is necessary to assure sound and reliable control for bankrupt companies when they emerge from the courts, in place of the type of control under which some railroads have been wrecked."

Under the present statute the District Court has definite responsibility in reorganization.  Subsection (e). After the certification from the Commission is filed, a hearing is authorized at which all interested parties may appear.  Additional evidence of opponents and proponents of the plan may be received upon "detailed and specific objections in writing to the plan and their claims for equitable treatment."  The judge shall then "approve the plan if satisfied that: (1) It complies with the provisions of subsection (b) of this section, is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will

[18] 79 Cong. Rec. 8851.  H. Rep. No. 1283, 74th Cong., 1st Sess., p. 1; compare draft of Coordinator's proposals, Report of the Federal Coordinator of Transportation (1935), H. Doc. No. 89, 74th Cong., 1st Sess., p. 229.

conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders;" and if satisfied as to fees, costs and allowances. If the plan is disapproved, the proceedings may be dismissed or referred back to the Commission for further consideration. On approval by the judge the plan is returned to the Commission for submission to stockholders and creditors for their approval. Submission to classes of stockholders or creditors may be omitted on a finding by the Commission, affirmed by the judge, of a lack of value in the equity of the stockholders or the claims of the creditors. On certification of the results of the submission the judge shall confirm the plan finally, if satisfied the requisite approval has been obtained or is excused for reasons stated in subsection (e). The judge is not empowered to approve or confirm any plan until it has first been approved by the Commission and certified to the court. Subsection (d).

The power of the court does not extend to participation in all responsibilities of the Commission. Valuation is a function limited to the Commission, without the necessity of approval by the court. The first sentence of the last paragraph of subsection (e) provides:

"If it shall be necessary to determine the value of any property for any purpose under this section, the Commission shall determine such value and certify the same to the court in its report on the plan."

The function of valuation thus left to the Commission is the determination of the worth of the property valued, whether stated in dollars, in securities or otherwise. One of the primary objects of the bill was the elimination of obstructive litigation on the issue of valuation [19] and the

[19] Report of the Federal Coordinator, *supra*, n. 18, pp. 100–103; H. Rep. No. 1283, 74th Cong., 1st Sess., p. 3; S. Rep. No. 1336, 74th Cong., 1st Sess., p. 3; Hearings on H. R. 6249, House Committee on the Judiciary, 74th Cong., 1st Sess., Ser. 3, April 15–25, 1935, pp. 26–31.

form finally chosen approached as near to that position as seemed to the draftsmen legally possible. Judicial reëxamination was not considered desirable.[20] None of the findings required of the judge under subsection (e) relate specifically to valuation. Congress apparently intended to leave the determination of valuation "of any property for any purpose under this section" to the Commission.[21] The language chosen leaves to the Commission, we think, the determination of value without the necessity of a reëxamination by the court, when that determination is reached with material evidence to support the conclusion and in accordance with legal standards. It leaves open the question of whether in reaching the result the Commission had applied improper statutory standards. This latter point is discussed under the heading of *Method of Valuation* in this opinion, p. 477, *infra,* where this plan is reviewed and upheld in this respect.

Another restriction on court action is that the determination as to whether the plan is "compatible with the public interest" rests, as valuation does, with the Commission. Subsection (d). Without attempting to forecast the limits of the phrase as used in the setting of this statute, it is sufficient in this case to determine, as we do, that it includes the amount and character of the capitalization of

[20] Cf. Hearings on H. R. 6249, *supra,* n. 19, pp. 249–50, 291–92, 317.

[21] The bill as recommended by the Federal Coordinator of Transportation, H. Doc. 89, *supra,* n. 18, p. 238, and in a different form as considered by the Committee on the Judiciary of the House, Hearings on H. R. 6249, *supra,* n. 19, p. 8, did not contain the quoted sentence. During the hearings, the Chairman sought advice as to whether it would be legally valid to make the valuation of the Commission final in practice. This was not denied although doubt was expressed whether the Commission's finding could preclude a certain limited amount of judicial review. See Hearings on H. R. 6249, *supra,* n. 20. After this discussion, the bill which was to pass the House was introduced on June 20, 1935, 79 Cong. Rec. 9814. It contained the quoted sentence, above referred to, in the form as it now appears in subsection (e).

the reorganized corporation. Cf. *New York Central Securities Co.* v. *United States,* 287 U. S. 12, 24. Leaving the problems of public interest to the Commission was not a departure from precedent. The phrase had been employed long before in the grant of authority to supervise the issue of securities. § 20a, Interstate Commerce Act.[22]

The problems of capitalization are of public interest. The corporate form is universally used for the business of railroading. Railroad securities are widely distributed in investment portfolios and among individual savers. The reasonable earning power of securities, the terms and conditions of the respective issues, and the soundness of the aggregate capitalization affect the public interest immediately and directly. Capitalization is an essential factor bearing on an efficient transportation system for shipper, investor and consumer. The development of the capitalization of the reorganized company which is entrusted solely to the Commission under the requirement that the plan be compatible with the public interest is that relating to the total amount of issuable securities and the quality of the securities to be issued. So long as legal standards are followed, the judgment of the Commission on such capitalization is final.

Thus limited, the District Court acts concerning the plans only upon the issues specifically delegated by subsection (e). As to these, its powers are negative. It may veto the plan in its entirety but may improve it only by suggestion. It becomes a necessary and important factor

[22] "The Commission shall make such order only if it finds that such issue or assumption: (a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose." 49 U. S. C. § 20a (2).

in railroad reorganization. These reorganizations may be attained only through properly coördinated action between the Commission and the court.[23] In this case, we are of the view that the District Court performed its required functions in accordance with the requirements of the statute. See page 466, *supra*.

*Amount and Character of Capitalization.* While the public interest phase of capitalization is not to be independently passed upon by the court, the court does have statutory authority to review for obedience to legal standards.[24] Petitioners in seeking certiorari and now on the merits concede that the exclusive power in the Commission to pass upon the amount and character of capitalization is subject to review for "arbitrary exercise." The respondent A. C. James Company makes the point that the restriction of the amount of capitalization to an aggregate limited by the reasonable probability of a fair return deprives those creditors and stockholders who are barred as holding claims without value, of their property interest in the debtor without due process and contrary to the mandate of § 77. The Commission thought that the public interest required a capital structure which would give the reorganized company "a reasonable opportunity to function efficiently and continuously" and that "proposed charges, whether fixed or contingent, shall be within its probable earning power." 230 I. C. C. at 87.

Assuming at this point that the Commission's valuation is sound and reached by allowable methods, a matter discussed later in this opinion at page 477, we hold that the elimination of the claims of stockholders and creditors

---

[23] Cf. *Palmer* v. *Massachusetts*, 308 U. S. 79, 87; *Warren* v. *Palmer*, 310 U. S. 132, 138; *United States* v. *Morgan*, 307 U. S. 183, 191; Report of President's Committee to Submit Recommendations upon the General Transportation Situation, Dec. 23, 1938, p. 25.

[24] See *Opp Cotton Mills* v. *Administrator*, 312 U. S. 126, 144.

which are valueless from participation in the reorganization is in accordance with valid provisions of § 77 (e).[25] Actual bankruptcy means a loss to some investors. Subsection (e) recognizes this inevitable result and provides a method for their elimination from the reorganization proceedings. After all of the reasonable value had been exhausted by senior securities, warrants might have been authorized for otherwise unsatisfied claims. Such warrants would represent merely the possibility of recoupment, just as the equity of redemption in judicial sales. But there is no constitutional or statutory requirement that such immediately valueless paper should be issued. A mere possibility that traffic might be found to the limit of the physical capacity of the system is not the kind of earning power which justifies the issue of securities based upon such a possibility. Whatever may be the limits of the power of the Commission to find claims worthless, the present plan may not be successfully attacked on the ground that Congress is powerless to authorize in bankruptcy the elimination of claims without value. *In re 620 Church St. Corp.*, 299 U. S. 24.

Nor do we find violation of legal standards in the requirement by the Commission for a capital fund or the issue of stock to former holders of interest-bearing securities. The Commission is charged with the development of a plan which must balance and choose between public and private interests. The evidence before the Commission gave grounds for the finding of a normal requirement of an annual $500,000 fund for improvements. It is reasonable to agree with the Commission that a substantial share of the securities should be fixed stock investments rather than that the entire aggregate amount, justified by

---

[25] Such a result was within the contemplation of the Congressional committee. Hearings on H. R. 6249, *supra*, n. 19, pp. 26, 80, 107, 118, 227, 255, 278.

estimates of probable earnings, should be in interest-bearing loans, which ultimately must be redeemed. Stock which has no retirement provisions is the backbone of a corporate structure.

*Method of Valuation.* While by the terms of the statute the valuation of the property is left to the Commission, without participation by the court, this valuation must be made in accordance with the direction of the statute and as to that valuation is subject to judicial review. This review is limited in character by the direction of subsection (e) that valuation shall be determined by the Commission. The District Court may review to determine whether the Commission has followed the statutory mandates of subsection (e). Subsection (e) requires valuations by the Commission to be "determined on a basis which will give due consideration to the earning power of the property, past, present, and prospective, and all other relevant facts. In determining such value only such effect shall be given to the present cost of reproduction new and less depreciation and original cost of the property, and the actual investment therein, as may be required under the law of the land, in light of its earning power and all other relevant facts." Thus, while judicial review does not involve an independent examination into valuation, it does require that the court shall be satisfied, upon the record before the Commission, with such additional evidence as may be pertinent to the objections to the Commission's finding of value, that the statutory requirements have been followed.

An example of this type of review occurs in this record. The Irving Trust Company, as Refunding Mortgage Trustee in Nos. 7 and 8, and the A. C. James Company object to the finding of the Commission that the bonds, $270,000, and stock, $360,834, par value, of the Central California Traction Company and $465,300, par value,

of the capital stock of the Alameda Belt Line, pledged only under the Refunding Mortgage, had no material value. 233 I. C. C. 414–416. These securities were owned solely by the debtor but in the case of the first company represented a one-third interest in the Traction Company and in the case of the second a one-half interest in the Belt Line. Competing transcontinental railroads owned the other interests. The respective ownerships were acquired to put the debtor in a position to obtain its fair share of the business from and to these feeder lines. The facts before the Commission showed that, over the preceding decade, the debtor had contributed annually substantial sums to meet the deficits of each of the companies. It was shown in the District Court that each of the companies were useful auxiliaries to the business of the debtor. However, valuation is essentially a problem for the Commission. There is material evidence to support its conclusion of lack of value and its conclusion has been accepted by the District Court. This is sufficient.

In the preceding section of this opinion, we discussed the validity of the provision of subsection (e) which permits the elimination from the reorganization of claimants without equity in the debtor's properties. This provision needs also to be considered from the standpoint of statutory review of the Commission's action. As to both stockholders and creditors the section requires that a plan which allows nothing to their claims, need not be submitted to them, if the worthlessness of their claims is found by the Commission, "and the judge shall have affirmed the finding." As to certain creditors and all stockholders in this case, both events took place. The specificity of the direction for reëxamination of the Commission's action points to a wider scope of review than an inquiry as to whether statutory standards for valuation have been followed. It is obvious that the valuation of the whole

of a debtor's property, in a simple case without conflict-
ing or divisional liens, will mark, by a mere mathematical
computation as to priorities, the claimants who must be
found to be without equity in whole or in part. But we
think the requirement of affirmation of the exclusion of
claimants does not require an independent appraisal of
the valuation which ordained their elimination. The
court properly affirms the Commission, when it finds no
legal objection to the Commission's use of its own valua-
tion to determine whether particular claimants are en-
titled to participate in the reorganization. For example,
there may arise controversies over the priority or the
validity of claims. A Commission finding involving such
problems would require an independent examination and
an affirmation by the court.

The Circuit Court of Appeals found error in the Com-
mission's failure to make definite valuations. It was of
the view that it was necessary to determine the values of
the respective claims in order to have a basis for the dis-
tribution of new assets.[26] This position respondents de-

---

[26] *In re Western Pacific R. Co.*, 124 F. 2d 136, 139: "To determine
this question, it was necessary to determine, as of the effective date of
the plan, the value of (1) each of the claims of Reconstruction Finance
Corporation, (2) the claim of Railroad Credit Corporation, (3) the
claim of A. C. James Company, (4) the claims of the holders of first
mortgage bonds now outstanding, (5) the $10,000,000 of new first
mortgage bonds, (6) the $21,219,075 of income bonds, (7) the 318,-
502.97 shares of new preferred stock and (8) the 319,441 shares of
new common stock which the plan provides shall be distributed to
said claimants.

"To determine the value of the above-mentioned claims, it was
necessary to determine the value of (1) the debtor's entire property,
(2) the property subject to the first mortgage now outstanding, (3)
the $18,999,500 of refunding bonds pledged to secure the claims of
A. C. James Company, Railroad Credit Corporation and Reconstruc-
tion Finance Corporation and (4) the other collateral pledged to se-
cure each of said claims. To determine the value of the refunding

fend, at least to the point of saying that claims may not be foreclosed or new securities allocated without a determination of the value of the property and the assets subject to secured claims, as well as earning power. The Commission considered the debtor's investment in its

bonds, it was necessary to determine the value of (1) the property subject to the refunding mortgage only and (2) the property subject both to the refunding mortgage and to the first mortgage now outstanding. This, of course, necessitated a determination as to which of the debtor's property is, and which is not, subject to each mortgage. *Consolidated Rock Products Co.* v. *Du Bois, supra.*

"To determine the value of the new first mortgage bonds, income bonds, new preferred stock and new common stock mentioned above, it was necessary to determine the value of (1) the debtor's entire property, (2) the property which would be subject to the new first mortgage and (3) the property which would be subject to the income mortgage.

"Subsection e of § 77 provides: 'If it shall be necessary to determine the value of any property for any purpose under this section, the [Interstate Commerce] Commission shall determine such value and certify the same to the court in its report on the plan.' In this case, as has been seen, it was necessary to determine the value of (1) the debtor's entire property, (2) each of the claims of Reconstruction Finance Corporation, (3) the claim of Railroad Credit Corporation, (4) the claim of A. C. James Company, (5) the claims of the holders of first mortgage bonds now outstanding, (6) the $10,-000,000 of new first mortgage bonds, (7) the $21,219,075 of income bonds, (8) the 318,502.97 shares of new preferred stock, (9) the 319,441 shares of new common stock, (10) the property subject to the first mortgage now outstanding, (11) the $18,999,500 of refunding bonds pledged to secure the claims of Reconstruction Finance Corporation, Railroad Credit Corporation and A. C. James Company, (12) the other collateral pledged to secure each of said claims, (13) the property subject to the refunding mortgage only, (14) the property subject both to the refunding mortgage and to the first mortgage now outstanding, (15) the property which would be subject to the new first mortgage and (16) the property which would be subject to the income mortgage. It thus became the duty of the Commission to determine these values and certify them to the court. That duty was not performed."

property, 230 I. C. C. 61, 65, its value for rate making purposes, *id.,* 76, and the record of its earnings, *id.,* 73 *et seq.,* together with its volume of traffic and other pertinent data. It concluded that these factors would justify fixed and contingent charges of no more than two million dollars annually. In addition, the Commission's plan provided for five per cent preferred stock and common stock in such amounts that it would require aggregate available annual earnings of a little more than four and a half million dollars to permit payment of a three per cent dividend. Without appraising the effect of income taxation on the remainder of earnings available and partly used for interest, it is significant that only three years in the period from 1922 to 1940 showed earnings available for interest of over four million. See page 457, *supra.* With this data, the Commission determined the new capital structure. See page 461, *supra.* Taking the lowest value for the no par suggested by the Commission, $57 per share, note 6, *supra,* there is a total value of securities of eighty-four million dollars plus. The Commission was thus of the view that the value of the property for purposes of reorganization was around this figure.

The Commission was familiar with railroad securities. Control over their issue by interstate carriers has been for many years in the Commission. § 20 (a), Interstate Commerce Act. The standards for issuance under § 20 (a) include "compatible with the public interest." Cf. *New York Central Securities Corp.* v. *United States,* 287 U. S. 12, 24. The provisions of this § 20 (a) were carried into and made a part of the reorganization section by subsections (c) (3) and (f). To create securities with voting power, in addition to those authorized, might well divorce control from real ownership. Sound railroad reorganization involves more than the partitioning of assets among creditors with valuable claims and the distribution to

creditors and stockholders without equity of so-called securities representing chances for then unforeseeable profits. The interest of the public in an adequate transportation service must receive consideration. *New England Divisions Case*, 261 U. S. 184, 189. Important property rights must be balanced against the need of sound financing. Consequently, the Commission limited the fixed and contingent charges involving the debt which must ultimately be paid, to two million annually, with stock representing the possibility of additional earnings. See note 5, *supra*, 230 I. C. C. 61, 92.

It is said that *Consolidated Rock Co.* v. *Du Bois*, 312 U. S. 510, forbids the substitution of an approved capital structure for determinations of value. In that case there was no finding of the values of the property involved and this Court said: "Absent the requisite valuation data, the court was in no position to exercise the 'informed, independent judgment' (*National Surety Co.* v. *Coriell*, 289 U. S. 426, 436) which appraisal of the fairness of a plan of reorganization entails," page 520. The District Court, it being a § 77B reorganization, was required to make the requisite valuations. The requirements for valuation are the same in a § 77B proceeding as in a railroad reorganization. There is nothing, however, in the *Du Bois* case to indicate that dollar valuations of the property or claims are essential for recapitalization or the distributions of securities in reorganizations. The defect in *Du Bois* was not the failure to find dollar values but the failure to find the worth of the security behind independent mortgages on distinct properties and of assets subject to the claims of particular groups of creditors. Such findings were required in that case because the court was dealing with a parent and two subsidiaries with inter-company accounts. Each subsidiary entity had its own creditors. The system was a unified operation and we held the claims

against the subsidiaries had priority over stockholders equity in the parent, p. 523. Without a separate valuation of assets, it was impossible to tell what assets of the parent were left to form the basis for the securities distributed to the parent's stockholders. In *Du Bois,* as here, the manner of reaching that valuation, so long as it complies with the statutory standards, is not important. There are subsidiaries here but there are no claimants of the subsidiaries looking to the parent. The aggregate of the authorized securities in the present case is to be equitably distributed among claimants against a single corporation. Findings were made as to the property covered by the different mortgages of the debtor and securities allocated on the basis of that finding. 230 I. C. C. 61, 98, 99, 100, 101; 233 I. C. C. 409, 414. Under such circumstances the lack of a valuation in dollars is immaterial. The important element is the allocation of the securities so as to preserve to creditors the advantages of their respective priorities. That is to say, senior claims first receive securities of a worth sufficient to cover their face and interest before junior claims receive anything. Consequently, we are of the opinion that the determination by the Commission of the aggregate amount of securities which may be issued against the system is in substance a finding of total value for reorganization purposes. In view of the factors of value considered and the opportunity given all parties before the Commission and the court to present all desired evidence, the Commission's determination stands upon a firm basis. There is no more important element in the valuation of commercial properties than earnings.[27] No offer was made to produce figures upon reproduction cost. It was not incumbent upon the Commission to do so. The Commission's conclusions impress us as in accord with the statutory requirements.

---

[27] Cf. *Consolidated Rock Co.* v. *Du Bois,* 312 U. S. 510, 525.

*Allocation of Securities.* There are two issues collateral to the Commission's valuation. One relates to adverse claims of prior liens between the holders of bonds secured on the one hand by the General and Refunding Mortgage and on the other by the First Mortgage. See p. 489, *infra*. The other is as to the correctness of the allocation of securities among the creditors. This latter issue is, of course, affected by the former. In considering allocation, we shall assume at this point what we later find, that the Commission's determination as to priorities is correct.

A. The allocation of securities is shown above at page 461. The table sets out that the holders of the Trustees' Certificates and the 5% First Mortgages, although they are senior- creditors, receive large quantities of preferred and common stock, as well as new income bonds. These stocks are securities of lower dignity than the income bonds. Some of these bonds on the other hand go to creditors secured by the refunding bonds. This is because the refunding bonds have a first lien on some assets. 233 I. C. C. 414. But at any rate, under the absolute priority rule of the *Boyd* case,[28] the stratification of securities issued to creditors need not follow invariably the relative priority of the claimants.[29] Apropos of a somewhat similar situation, we said in *Consolidated Rock Co.* v. *Du Bois*, 312 U. S. at p. 530:

"If the creditors are adequately compensated for the loss of their prior claims, it is not material out of what assets they are paid. So long as they receive full compensatory treatment and so long as each group shares in the securities of the whole enterprise on an equitable basis, the requirements of 'fair and equitable' are satisfied."

---

[28] *Northern Pacific Ry. Co.* v. *Boyd*, 228 U. S. 482.

[29] *Group of Institutional Investors* v. *Chicago, M., St. P. & P. R. Co., post*, pp. 562–565.

B. A point is made as to the treatment of the Reconstruction Finance Corporation's claims in the distribution of securities. It is to be noted, p. 455, *supra,* that R. F. C. has two kinds of claims; one for $10,000,000 upon Trustees' Certificates for money advanced to the debtor while in reorganization, the other for $2,963,000 Collateral Notes, secured by refunding mortgage bonds. The Railroad Credit Corporation and the A. C. James Company are holders of similar collateral notes. The amount of bonds, as compared with the face principal of the indebtedness, varies. The R. F. C. has the most valuable collateral per dollar of indebtedness. To retire the Trustees' Certificates and to raise necessary new money for the reorganization, the Commission deemed it essential to sell $10,000,000 of new first mortgage, 4% bonds of 1974. To assure this, the Commission provided:

"That the [R. F. C.] purchase the bonds at par and accrued interest and that, in consideration of such purchase and the value of the collateral securing its claim, the Finance Corporation receive, for the secured notes of the debtor held by it, treatment equal to that accorded the holders of the debtor's existing first-mortgage bonds."

Respondents' objections to this ruling are that the Commission acted without a finding of the value of the new bonds or their marketability at par, that the advancement of the R. F. C. secured claim to priority over the like claims of other holders violates absolute priority and that there is no finding of reasonable equivalence between the preference and the value of R. F. C.'s taking the bonds. It is further urged that securities distributed to the R. F. C. to refinance the Trustees' Certificates "should be in recognition of the priority inherent in that transaction" and not in connection with the loan of R. F. C. to the debtor, which was made prior to reorganization proceedings.

It is admitted that the $10,000,000 Trustees' Certificates or such of them as are presently held by the R. F. C. are worth par. No finding was made by the Commission of the value of the new Firsts. Evidence before the court showed them of a value between 80 and 90 and of poor marketability on account of the system's interest record. The court made no finding as to either.

If the R. F. C. were treated on its notes, on the basis of the proportion of bonds held as collateral, precisely as the other noteholders, it would receive $414,175 of income mortgage bonds and $649,516 of new preferred stock, in addition to its proportion of common stock. 233 I. C. C. 409, 416. This proportion of common stock would allot a much greater aggregate of common stock to the R. F. C. than it obtained by the adjustment. By reason of accepting the less valuable new Firsts in lieu of cash for its $10,000,000 Trustees' Certificates, it will receive for the principal of its claims $1,185,200 of new income bonds and $1,777,800 of new preferred stock. The R. F. C. received its unpaid interest in no par common stock at $57 per share. This is the same allocation given claimants who hold the old Firsts. 233 I. C. C. 409, 452. The other noteholders received a large proportion of the principal of their claims in no par common stock at $62 per share.

It is difficult to appraise in dollars, as of the date of the Commission approval, the advantage secured for the plan by the arrangement with R. F. C. It is equally difficult to appraise similarly as of that date the value of the Trustees' Certificates relinquished by the R. F. C. over the value of the new Firsts or to determine how much of additional worth the R. F. C. obtained. The argument that the Commission does not have statutory authority to pay a creditor, even R. F. C., a government banking corporation, for furnishing new money has little weight. Nor do we see any reason why all claims of R. F. C. may not be considered by the Commission as a single claim. *Consolidated*

*Rock Co.* v. *Du Bois,* 312 U. S. 510, 520. There is nothing to lead us to a conclusion that the Commission gave any advantage to R. F. C. for which full consideration was not given. New money, the Commission said, "is absolutely necessary to effect a reorganization." 233 I. C. C. 409, 414. We have no reason to think the Commission allowed more compensation for this new money to R. F. C. than it would have been compelled to allow in some way, by interest or additional collateral or otherwise to another supplier. We conclude there was nothing in the discretionary action of the Commission to justify its invalidation.

C. We have held hereinbefore that valuation might be made by a method based primarily upon earnings and that so long as creditors receive "full compensatory treatment" their priorities may be represented by securities of different ranks. The Commission has made allocations of securities to the various creditors according to its judgment of the worth of their creditor position or priority in relation to the total worth of the property. It has found specifically that certain claims, under its valuations, have no value. We have pointed out the evidence before the Commission on the question of value. We cannot see that putting definitive dollar values on the whole and on parts of this property would aid the Commission in its work of valuation or the courts in their limited review of the Commission's action.

By its order of June 21, 1939, section P, 233 I. C. C. 441, 451, confirmed September 19, 1939, 236 I. C. C. 1, the Commission authorized the issue of around eighty-four million dollars of securities against the system property. This treats the equipment trusts and the securities with a face value as worth par and the no par common stock at $57 per share for all recognized creditors except the Railroad Credit Corporation and the A. C. James Company. For distribution to these latter two creditors, the common was valued at $62.

The Commission had before it the data pertaining to past traffic, receipts, earnings and operating ratios, the system's physical condition and prospects for business. This gave an adequate basis for an intelligent estimate of future income likely to be available to meet annual charges before dividends and those dividends themselves.

From this information, a conclusion was reached as to the debts which could be paid in the order of their full or absolute priority. *Case* v. *Los Angeles Lumber Co.,* 308 U. S. 106, 117. The secured claim of A. C. James Company could not be satisfied in full even with the more liberal valuation of the common stock. Claims of lesser dignity were eliminated. Those entitled to priority over the mortgages, that is, current liabilities, trustees obligations and reorganization expenses, were to be satisfied by cash or assumed by the reorganized company as a charge on its assets superior to the new securities. 233 I. C. C. 409, 452; 230 I. C. C. 61, 100, 101, 102. This left as creditors only the holders of the old 5% Firsts, with an underlying mortgage on the greater part of the property, the R. F. C., the Railroad Credit Corporation and the A. C. James Company, the latter three with refunding mortgage bonds as collateral. We have already explained the arrangement whereby R. F. C. acquired the status of a first mortgage bondholder. Here it is sufficient to say that as determined by the Commission the Refundings had a lien superior to the Firsts on some assets (233 I. C. C. 414), and the First superiority over the Refunding on the major portion. 230 I. C. C. 61, 97. See *infra, Priorities of Conflicting Liens.* With the foregoing facts and primary findings before it, the Commission drew the final conclusion as to allocation of securities as set out on page 461, *supra.* This allocation was based upon "the relative priority, value and equity of the various claims." Cf. 233 I. C. C. 414, 416, 417, 451 P. The distribution and report seems in accord with the re-

quirements and standards of subsections (b), (d) and (e) (1), note 7, *supra*.

*Priorities of Conflicting Liens.* No. 61 is a petition by the Irving Trust Company, trustee of the General and Refunding Mortgage, which raises questions of the priority between the Refunding Mortgage and the First Mortgage as a lien on three classes of property. These are the debtor's equity in certain rolling stock and equipment acquired under equipment trusts and a lease, the debtor's interest in the Northern California Extension and the debtor's title to certain "non-carrier" property. The Commission's plan is predicated on the priority of the First Mortgage as a lien on these properties and the Commission accordingly undertook tentatively to determine the legal questions involved. The Commission held that the First Mortgage, senior to the Refunding Mortgage, should be considered to be a first lien on these three classes of property. Petitioner, the Irving Trust Company, as substituted trustee under the Refunding Mortgage, made appropriate objections but the ruling of the Commission was adopted by the District Court. In reversing on appeal, the Circuit Court of Appeals did not pass on the question though the issue was presented. The point is made here by a party prevailing below, the petitioner Irving Trust Company, on behalf of holders of refunding mortgage bonds. As the matter is fully presented by the petition for certiorari and its decision is essential to a complete review of the District Court we have concluded to consider the question. § 240 (a) Judicial Code, 28 U. S. C. § 347. *United States* v. *Bankers Trust Co.*, 294 U. S. 240, 294, 295. Such action is in the interest of expedition. *Continental Bank* v. *Chicago, R. I. & P. Ry. Co.*, 294 U. S. 648, 685. Cf. *Story Parchment Co.* v. *Paterson Co.*, 282 U. S. 555, 567; *Cole* v. *Ralph*, 252 U. S. 286, 290.

The issues are those of construction of the terms of the First Mortgage. In the case of the first two classes of property, which were acquired after 1916, the year of the mortgage, the question is whether such property is covered by the after-acquired property clauses of that indenture and in the case of the third class, the "non-carrier" real property, the question is the application of the granting clauses to property not intimately connected with the operation of the road at the time of the 1916 reorganization of the debtor. None of the parties relies, at least as to personalty, on the controlling nature of rules of law of a particular jurisdiction. The Commission treated the question as one of the interpretation of the language of the mortgage and we shall do likewise.

A. As to the first class of property, it is the contention of the trustee of the Refunding Mortgage that the debtor's equity in the rolling stock subject to the three equipment trusts and the lease is not subject to the lien of the First Mortgage and that it is subject to the lien of the Refunding Mortgage. Since nothing turns on the difference between the equipment trusts and the lease, they will not further be distinguished. This equity is stipulated to have been worth over $6,000,000 on December 31, 1935, the nearest date available to August 21, 1935, the date of the filing of the petition. Since the obligations secured by all the refunding mortgage bonds outstanding amount to eleven millions it is apparent that determination of this question in favor of the refunding mortgage bondholders would go far towards assuring them equality of treatment with first mortgage bondholders.

The equipment trusts, the usual method of financing the acquisition of rolling stock, were created in 1923, 1924, 1929 and 1931. All are dated between the execution of the First Mortgage and the Refunding Mortgage. Under all, as is usual, the trustee retained title to the equipment,

the debtor's equity in the property increasing as it satisfied the serially maturing obligations. The obligations of two of the trusts have become fully satisfied since the institution of this proceeding.

The first of the granting clauses of the First Mortgage conveys presently owned railroad lines, equipment and other property formerly the property of the debtor's predecessor and specifically enumerating, under the subheading "equipment," several varieties of cars and "other rolling stock." Granting clause third, entitled "after-acquired property," covers

"Any and all property and facilities of any and every kind and description, including . . . equipment . . . and any and all right, title and interest in any of such properties or facilities which may from time to time hereafter be acquired or constructed by or belong to" the debtor, if such property falls into any one of four categories:

(1) Property acquired "by the use of First Mortgage Bonds or proceeds thereof or cash deposited" under the first mortgage "or on account of the purchase, acquisition or construction thereof or work thereon" such bonds or sums are paid out; or

(2) Property constituting "an integral part or parts of lines of railroad, extensions, branches, or other property subject to the lien" of the first mortgage; or

(3) Property "used or acquired for use in or for the maintenance or operation of or appertaining to" any of the property subject to the lien of the first mortgage; or

(4) Property consisting of securities of or other interest in the property of the Salt Lake City Union Depot & Railroad Company or Standard Realty and Development Company, or any subsidiary as defined.

The fifth granting clause covers a great variety of properties and facilities used in the operation of a railroad,

including tracks, bridges, tunnels, telegraph and telephone lines, floating equipment and specifically several kinds of cars "and other rolling stock and equipment" and "all other property of every description and all rights and interests in or with respect to the use of property;

"provided that the foregoing or any thereof, whether now owned by the Company or at any time hereafter acquired by it . . . shall be appurtenant to or used or held for use as, or as a part or as parts of, or to facilitate or safeguard the maintenance or operation of, any lines of railroad, extensions, branches . . . or other properties now or at any time hereafter subject to the lien of this indenture. . . ." [30]

Following the habendum clause is a proviso, hereafter referred to by its two opening words, reading:

"Subject, However, as to all equipment now owned to the equipment trust or conditional sale agreements secured thereon, and as to equipment hereafter acquired, to the equipment trust or conditional sale agreements to which the same shall be subject as permitted hereby, . . ."

---

[30] This clause also grants "any and all replacements, renewals, improvements and betterments of and additions to" any of the lines or property subject to the lien of the mortgage. In view of the holding as to the effect of those clauses quoted in the text it will be unnecessary to consider the contention of the trustee of the First Mortgage that this clause, as supplemented by certain covenants, independently subjects the debtor's equity in equipment trust rolling stock to the lien of the mortgage.

There are six granting clauses. The second covers all lines, lands, structures and equipment and other property, interests or rights, legal or equitable, then owned by the Company, and not set forth particularly. The fourth provides for the grant of additional security, and the sixth covers legal and equitable rights, claims and demands, and rents and income in the property subject to the lien of the indenture.

It is stipulated that all the equipment subject to the equipment trusts in question was acquired for use and was used on all of the debtor's lines, including those specifically described in the granting clauses. This would seem to make clear that the debtor's equity in equipment trust rolling stock is covered by the lien of the First Mortgage. Subdivision (3) of the third, after-acquired property clause, as well as the fifth granting clause, applies.

The refunding mortgage trustee relies, however, on a clause found between the sixth granting clause and the habendum, hereafter referred to as the reservation clause, and reading:[31]

---

[31] The portion of this clause preceding that quoted in the text provides:

"But nothing express or implied in this indenture shall be construed to limit the right or power of the Company or any successor or purchasing corporation, which right and power is hereby expressly reserved, by the use of its credit or free funds or by the use of First Mortgage Bonds delivered to the Company or any successor or purchasing corporation as in this indenture provided to reimburse the Company or any such successor or purchasing corporation for expenditures theretofore actually made out of its free funds, to construct or acquire free from the lien hereof lines of railroad, extensions or branches or interests therein, equipment, stocks, bonds or other securities or other property, rights, franchises, immunities or privileges provided the same shall not be lines of railroad, extensions, or branches or interests therein, equipment, stocks, bonds or other securities, or other property, rights, franchises, immunities or privileges (a) on account of the purchase, acquisition or construction whereof or work whereon First Mortgage Bonds shall be authenticated and delivered or their proceeds or other cash deposited hereunder shall be paid out as herein provided; or (b) consisting of, or if securities representing, property or facilities constituting an integral part or parts of lines of railroad, extensions, branches or other property subject to the lien of this indenture or some other integral portion whereof is or integral portions whereof are subject to the lien hereof or represented by securities subject to the lien hereof; or (c) consisting of or, if securities, representing property or facilities used or acquired

494

"and the Company may, unless First Mortgage Bonds shall have been authenticated and delivered or their proceeds or other cash deposited hereunder paid out against the same, purchase and acquire equipment, free from the lien hereof, by lease, conditional sale agreement or under any form of equipment trust, or purchase such equipment and issue obligations therefor secured by mortgage or pledge of such equipment superior to the lien of this indenture."

It is argued that this reservation permits the acquisition of rolling stock entirely free from the lien of the First Mortgage, unless acquired, as was not the case here, by the use of proceeds of the first mortgage bonds.[32]

---

for use in or for the maintenance or operation of or appertaining to any of the lines of railroad, extensions, branches or other property subject, or represented by securities subject, to the lien of this indenture; or (d) consisting of shares of stock in or other securities of said The Salt Lake City Union Depot and Railroad Company or said Standard Realty and Development Company or any subsidiary company or of any right, title or interest which the Company or any successor or purchasing corporation may acquire in or to any of the property of either of the companies above named or in or to any line of railroad or other property of any corporation which shall then be or immediately prior thereto shall have been a subsidiary company as the term subsidiary company is defined in Section 2 of Article Second hereof; . . ."

[32] The trustee finds further support for this argument in a comparison of the four limitations on the acquisition of property from free funds found in the opening portion of the reservation clause, quoted in the preceding footnote, with the latter portion of the clause, quoted in the text. The opening portion contains four limitations, of which only two are relevant to this argument. The first of these four limitations is that the property may not be acquired by the use of first mortgage bonds or their proceeds and the third relates to property acquired for use in the operation of the road which is subject to the mortgage. It is only this first limitation which is repeated in the latter portion of the reservation clause. It is argued that the omission to repeat the limitation as to property acquired for use in the operation of the road shows an intention that such a limitation should

We do not so view the reservation. It rather performs the function of authorizing the acquisition of equipment by equipment trust or other method and only to that extent displacing the lien of the First Mortgage arising from the after-acquired property clauses. The granting clauses show a purpose to subject to the First Mortgage all the

not apply in that latter portion. From this it is said to follow that property acquired for use in the operation of the road but not bought with first mortgage moneys is not subject to the mortgage, i. e., that the words "the Company may . . . purchase . . . equipment, free from the lien hereof, by lease, conditional sale agreement or under any form of equipment trust" should be read literally without regard to the purpose of the clause taken together with the remainder of the mortgage. Thus all but the conclusion of this argument is merely a variation of the argument discussed and rejected in the text, that the words "free from the lien hereof" are to be taken literally and that the purpose of the latter portion of the reservation clause was to accomplish the result contended for by the refunding mortgage trustee.

If it be said that the words "free from the lien hereof" in the opening portion of the reservation clause have a different meaning from that which we give those same words in the latter portion of the clause, the answer must be that, in view of the different functions of the two portions of the reservation clause, the difference is required. The opening portion is entirely consistent with granting clause third and the remainder of the reservation clause.

The four limitations in the opening portion of the reservation clause substantially correspond to the four categories of after-acquired property which are subject to the mortgage under granting clause third. By the third granting clause, after-acquired property in these four categories is subject to the mortgage. By the opening portion of the reservation clause, property not in these categories may be purchased with free funds and will be free from the mortgage. This is so because the categories, as defined in both places, do not comprehend property unconnected with the road of the debtor. Thus the purchase with free funds of a foreign railroad or of domestic real estate unconnected with the road would be permissible under the opening portion of the reservation clause, would not have been covered by the third or fifth granting clauses and might conceivably be the subject of a supplemental indenture under granting clause sixth. See n. 30, *supra*.

property and equipment used in connection with the road. There is repeated general mention of the grant of rolling stock, of legal and equitable interests. The third and fifth granting clauses fully cover this after-acquired equity in rolling stock purchased through equipment trusts and the "Subject, however" clause clearly contemplates that the First Mortgage shall be a lien on equipment second only to equipment trust agreements. That clause provides for the subordination of the First Mortgage to equipment trust agreements to which after-acquired equipment shall be subject "as permitted hereby." These last words, a reference to the reservation clause, confirm our view that the function of the reservation clause is merely to permit the purchase of equipment by that method and not to authorize the completely untrammeled acquisition of such equipment.

It is urged that the words "free from the lien hereof" in the reservation clause must be given their literal significance. The argument must fail aside from the difficulties inherent in a suggestion that these words shall be lifted from context and forcibly applied without reference to an intention fairly to be drawn from three specific clauses of the mortgage and reinforced by the entire scheme of the document. The reservation clause provides that the company may acquire equipment "free from the lien hereof" if the method be by lease, conditional sale or equipment trust but may "purchase such equipment and issue obligations therefor secured by mortgage or pledge of such equipment superior to the lien of this indenture." Why the difference? Equipment acquired for cash would unquestionably become subject to the First Mortgage. Equipment acquired under a purchase money chattel mortgage would under this clause be subject to the mortgage. The First Mortgage would merely be junior to the chattel mortgage. Yet equipment acquired under an equipment trust agreement is said to be entirely

free of the mortgage. The inconsistency [33] of such a result suggests that the phrases "free from the lien hereof" and "superior to the lien of this indenture" are in a sense correlative and were merely suited to the different title situations in the two methods of financing.

B. The Northern California Extension is a 112 mile branch of the debtor's main line and runs from Keddie, California, to the Great Northern Railroad at Bieber, California. It has been profitable since its construction in 1932 and the Commission expects that its traffic will increase. As has been stated the question as to the extension is whether it is covered by the after-acquired property clauses of the First Mortgage. Slightly less than one-half the cost of the extension, or about $5,000,000, was financed by the sale of first mortgage bonds; another $5,000,000 was realized from the sale of unsecured debentures to the A. C. James Co., later replaced by collateral notes secured by refunding mortgage bonds, and the remainder, approximately $500,000, was borrowed from the R. F. C. on the security of refunding mortgage bonds. [34]

---

[33] No reason suggests itself as to why equipment acquired for cash should have been intended to be covered by the First Mortgage and equipment acquired by the equipment trust method not be subject to the mortgage after the equipment trust obligation is completely satisfied. Yet this is a consequence of the argument pressed upon us.

[34] Construction of the extension was begun in August, 1930, and by the end of December a substantial amount of the work had been completed. Connection with the Great Northern was made on November 10, 1931, and freight service was then inaugurated under the jurisdiction of the construction department. On June 1, 1932, the line was placed in full operation. The cost of construction to May 31, 1932, was $10,183,641.90 and additional sums were later expended. It was financed as follows: First mortgage bonds in the amount of $5,000,000 were sold at 97½ between February 11, 1931, and January 29, 1932, producing $4,875,000. Between February 27, 1931, and May 31, 1932, $5,000,000 of debentures, issued under an indenture dated July 1, 1930, were sold for cash at par to A. C. James Co. These debentures were retired in March and May, 1932, through

In view of this, the refunding mortgage trustee contends that the First Mortgage should as a matter of equity be held a lien on the extension only to the extent of first mortgage moneys used or that it be held a first lien on a portion of the mileage equal to the proportion that first mortgage moneys bore to the total cost, or on an undivided interest in the extension in the same proportion. But here again the terms of the First Mortgage preclude such a contention. The third granting clause covers "any and all property . . . including . . . extensions . . . if

"(a) acquired or constructed by the use of First Mortgage Bonds or proceeds thereof or cash deposited hereunder (except bonds delivered or cash paid out under any of the provisions of this indenture in reimbursement of previous expenditures certified as hereinafter provided) or on account of the purchase, acquisition or construction thereof or work thereon First Mortgage Bonds shall hereafter be authenticated and delivered or the proceeds of First Mortgage Bonds or other cash deposited hereunder shall hereafter be paid out under any of the provisions of this indenture; . . ."

The reservation clause supplements this by its provision that the right to acquire property free of the lien shall not extend to "lines of railroad, extensions or branches . . . (a) on account of the purchase, acquisition or construction whereof or work whereon First Mortgage Bonds shall be authenticated and delivered or their pro-

---

the issue of notes to the A. C. James Co. for $4,999,800 ($200 being paid in cash) secured by a pledge of $6,249,500 face amount of refunding mortgage bonds. The Refunding Mortgage was executed and delivered February 29, 1932, as of January 1 of that year. The remainder of the total cost of construction was financed by loans of $559,408 procured from the R. F. C. in March, June and August, 1932. These were parts of larger loans and were secured by refunding mortgage bonds.

ceeds or other cash deposited hereunder shall be paid out as herein provided; . . ." See n. 31, *supra*.

The substantial nature of the financing of the extension by the sale of first mortgage bonds is a matter of record and we hold that the quoted portion of the third granting clause and especially the clause beginning "or on account of the purchase, acquisition or construction thereof or work thereon" bring this extension within the coverage of the First Mortgage. In opposition to this conclusion it is said that it would permit the First Mortgage to become a lien on the extension if only one penny of first mortgage money had been used. That is, of course, not our case. Here we have a considered plan for financing an extension which contemplated that 50% of the necessary moneys be procured through the sale of first mortgage bonds. The terms of the after-acquired property clause disclose an intention that where at least such part of the funds used for the construction of such an extension are first mortgage funds that the entire extension should be subjected to the lien of the mortgage. The refunding mortgage trustee contends that it is inequitable to give the first mortgage bondholders a lien to the extent of all first mortgage bonds outstanding when in fact those bondholders contributed only $5,000,000 to the cost of construction and the refunding mortgage bondholders contributed the remainder. The asserted inequity disappears on a reference to the record where it plainly appears that the parties concerned had no understanding that the lien situation would be different from what we have held it to be.[35]

---

[35] The primary parties concerned were The Western Pacific Railroad Corporation, purchaser of the $5,000,000 of first mortgage bonds in question, and the A. C. James Co., purchaser of a like amount of debentures. The A. C. James Co. in 1929 offered to finance the cost of the extension in return for a first lien thereon. It was then believed

C. Lastly, the refunding mortgage trustee makes a limited claim against certain "non-carrier" realty which is alleged to be completely free of the lien of the First Mortgage. The refunding mortgage trustee believes that this property should be given consideration as unmortgaged property in the allocation of securities to the refunding mortgage creditors.

---

that the cost of the extension would be approximately $5,000,000. When it developed that it would greatly exceed that amount, the A. C. James Co. withdrew this offer and substituted another offer to advance 50% of the moneys needed, the advances not to exceed $5,000,000. No mention was made in this second offer of a first lien or, indeed, of any lien and the indenture under which the debentures were issued was equally silent. The parties were fully aware that the remaining 50% of the cost would be paid by the sale of first mortgage bonds or other funds. The second offer, in the form of a commitment to bid at public sale, was accepted by the debtor.

The specifications referred to in the notice calling for bids on the debentures contain the following:

"The main line of railroad of the Company extends from San Francisco, California, to Salt Lake City, Utah, with branches, and aggregates 1050.5 miles more or less of first track. Upon the completion of the Company's 'Northern California Extension' its main line of railroad will aggregate 1198.5 miles, more or less. A map of the Company's railroad system is hereto annexed.

"The First Mortgage of this Company dated June 26, 1916, securing this Company's First Mortgage Bonds, whereunder not more than $50,000,000 thereof may be outstanding at any one time, is a first lien on said main line of railroad."

The bid of the A. C. James Co. stated that it was made in accordance with the specifications, which had been examined by the bidder.

The specifications in connection with the offers of the $5,000,000 of first mortgage bonds contain similar statements:

"Said First Mortgage constitutes a first lien on the main line of railroad of the Company extending from San Francisco, California, to Salt Lake City, Utah, and branches, aggregating 1050.5 miles, more or less, of first track, the Company's terminal and other railroad properties in the cities of San Francisco, Oakland and elsewhere, and certain of its rolling stock and equipment. Upon the comple-

The greater part of this property, which was not used for railway purposes, was acquired from the debtor's predecessor, the Western Pacific Railway Company, pursuant to its reorganization in 1916, and the question is whether this property is within the terms of the First Mortgage.[36] We answer this question affirmatively. Despite the fact that it is or was not used for transportation purposes, the mortgage nevertheless covers it by the conveyance of:

"First.—All and singular the following described lines of railroad, terminals, lands, equipment, shares of stock and other real and personal property and interests and rights in property owned by the Company or to which it may be entitled, formerly the property of or belonging to

---

tion of the construction and/or acquisition of the Company's 'Northern California Extension' its main line of railroad will aggregate 1198.5 miles, more or less. A map of the Company's railroad system is hereto annexed."

The bids of The Western Pacific Railroad Corporation contain a reference to the specifications similar to that in the bid of the A. C. James Co.

Mr. A. C. James was during this time the president and a director of the A. C. James Co., a director of the Western Pacific Railroad Corporation and a director of the debtor.

It is not suggested that the understanding of the Reconstruction Finance Corporation as to the lien of the refunding mortgage bonds pledged with it to secure the loans made to complete payment for the extension was different. See Western Pac. R. Co. Reconstruction Loan, 180 I. C. C. 645, 646, 648–9, an exhibit herein.

[36] A portion of this "non-carrier" property was acquired after 1916, some of it by the use of first mortgage moneys and some of it in substitution for property released from the lien of the First Mortgage. The refunding mortgage trustee makes no claim to the property acquired by the use of first mortgage moneys. Another small portion of the property was acquired after 1916 but without the use of first mortgage moneys, for use as future industrial sites and for gravel pit purposes. The claim to this last property is not specified in the briefs of the refunding mortgage trustee and it seems to be of such negligible value as would not warrant a reallocation of securities if it were to be held that this property is not subject to the first mortgage lien.

Western Pacific Railway Company, a corporation of the State of California, or its receivers: . . ."

. . . . .

"III. All terminals and all lands and interests in lands, easements therein and improvements thereon, including, among other things, yards, station and depot grounds, sheds, station houses, freight houses, warehouses, elevators, stock-yards, car-houses, engine houses, oil tanks, water tanks, water supply, shops, hotels, boarding houses, hospitals, docks, wharves, piers, slips, telephone and telegraph lines and other structures and erections and the appurtenances of all and every of the foregoing, whether or not for use in connection with said or any lines of railroad."

The last subdivision of the first granting clause, which follows six subdivisions specifically describing certain properties, conveys:

"other property.

"VII.—All and singular the property, interests and rights, (except cash, accounts and bills receivable, traffic and other operating balances and other cash items) not comprised in the descriptions contained in the foregoing subdivisions of this clause First of these granting clauses, which belong to the Company or to which it may be entitled in any manner and which heretofore were owned by Western Pacific Railway Company or to which said company was or its receivers were entitled."

Reinforcing these provisions is the second granting clause:

"Second.—All other lines of railroad, extensions, branches, terminals, lands, structures, equipment, shares of stock, bonds, notes and other securities, claims, franchises, privileges and immunities and other property and estates, interests and rights (whether legal or equitable) now owned by or belonging to the Company, notwith-

standing the same or any thereof may not be particularly set forth in these granting clauses."

In these clauses it is repeatedly specified that all property, railroad or otherwise, formerly owned by the debtor's predecessor and to which the debtor succeeded, is to be subject to the First Mortgage.

We therefore affirm the District Court's conclusion adopting the Commission's tentative determinations as to the priority of the First Mortgage.

*Accommodation Collateral.* The debtor, The Western Pacific Railroad Company, objects to the provision of subdivision R of the Commission's final order, approved by the District Court, directing that

"All collateral pledged by the debtor as security for notes to the Reconstruction Finance Corporation, the Railroad Credit Corporation, and the A. C. James Company shall be reduced to possession by the respective pledgees thereof, and shall be by them surrendered to the reorganized company and canceled, . . ." 233 I. C. C. 453; 34 F. Supp. 493, 505.

This order arises from the following circumstances. As is shown on page 455, *infra,* the Reconstruction Finance Corporation, the Railroad Credit Corporation and A. C. James Company have notes of the debtor secured by pledges by the debtor of various amounts of the debtor's General and Refunding Bonds and other collateral.[37]

---

[37] The claims and security therefor were found by the Commission to be, as of June 30, 1938, as follows: "class 3 items consisted of $4,999,800, face amount, of notes to the A. C. James Company, on which accrued and unpaid interest amounted to $1,124,955, and which are secured by $4,249,500, principal amount, of the debtor's general and refunding bonds, and a second lien upon $2,000,000, principal amount, of the same issue of bonds held by the Railroad Credit Corporation; class 4 items consisted of $2,963,000, face amount, of notes to the Reconstruction Finance Corporation, on which accrued and unpaid

To assist the debtor in obtaining the Reconstruction Finance Corporation and Railroad Credit Corporation loans, the A. C. James Company furnished to the debtor a block of refunding bonds, previously issued to A. C. James Company by the debtor, and Western Pacific Corporation furnished to the debtor other collateral described in the Commission finding. These securities were a part of those then pledged by the debtor to secure the notes held by Railroad Credit Corporation and Reconstruction Finance Corporation, which knew the source of the collateral at the time.

The debtor's objection to the Commission's order is stated by it as follows:

"In substance, the Commission provided that the collateral owned and pledged by the Debtor should be surrendered to the reorganized Company but that the accommodation collateral borrowed from others and pledged by the Debtor should be confiscated; or, to state the proposal somewhat differently, the accommodation collateral is to be resorted to first instead of last as is required by the most elemental principles of equity and by the authorities cited below."

---

interest amounted to $649,181, the notes being secured by $10,750,000, principal amount, of the debtor's general and refunding bonds, and voting-trust certificates for half of the voting stock of the Denver & Rio Grande Western Railroad Company, and a second lien upon $2,000,000, principal amount, of the same issue of bonds held by the Railroad Credit Corporation; class 5 items consisted of $2,445,610, face amount, of notes to the Railroad Credit Corporation, on which accrued and unpaid interest amounted to $135,296, which notes are secured by $4,000,000, principal amount, of the debtor's general and refunding bonds, and a second lien upon the security held by the Reconstruction Finance Corporation, an assignment of certain advances by the Western Pacific Railroad Corporation, and an assignment of the distributive share of the debtor under the marshaling and distributing plan, 1931; . . ." 230 I. C. C. 77.

We think, however, that the objection is not sound and that the Commission's order is correct. These are our reasons: The refunding bonds pledged by the debtor to secure the A. C. James Company note and left in that position throughout were pledged directly by the debtor and are not accommodation collateral in any sense. Nor do we need give consideration to the accommodation collateral behind the Reconstruction Finance Corporation and Railroad Credit Corporation notes other than the refunding bonds. In the earlier order approving the plan, the Commission provided that the rights of the Reconstruction Finance Corporation and Railroad Credit Corporation "in collateral pledged with them by parties other than the debtor" should not be disturbed or altered. 230 I. C. C. 102; subdivision O of the order of October 10, 1938, *id*. 114. On consideration of the petitions for modification of this order, the Commission refused to direct that this collateral be "surrendered to the pledgors thereof." 233 I. C. C. 431, 432. In its order, however, promulgating the present plan there is no clause comparable to subdivision O of the previous order preserving the rights of Reconstruction Finance Corporation and Railroad Credit Corporation in the collateral pledged with them by "parties other than the debtor." The sole provision in the final order as to the collateral behind the Reconstruction Finance Corporation and Railroad Credit Corporation is that found in subdivision R and quoted at the opening of this section of this opinion, directing the collateral pledged by the debtor with Reconstruction Finance Corporation, Railroad Credit Corporation and A. C. James Company, be reduced to possession, surrendered to the reorganized company and canceled. This was entirely proper. None of the collateral, other than the refunding bonds, was a claim against the debtor. A. C. James Company and the Western Pacific Corporation

perhaps had unsecured claims against the debtor for their securities and other collateral which the debtor had borrowed but these were held worthless as claims against the debtor. 233 I. C. C. 452. This collateral, other than the refunding bonds, was therefore left with the pledgees with its position unaffected by any direct action of the Commission.

The "collateral pledged by the debtor" referred to in the excerpt from subdivision R of the Commission's final order, 233 I. C. C. 453, quoted above, can be only the general and refunding bonds of the debtor, including those previously furnished by A. C. James Company. The words used in subdivision R to describe them are the same used by the Commission in distinguishing the refunding bonds from the remainder of the accommodation collateral. 233 I. C. C. 431, 432. Of course the collateral loaned to the debtor which was not an obligation of the debtor could not be ordered by the plan to be canceled. It remained with the pledgees. This "collateral pledged by the debtor" was properly to be reduced to possession by the pledgees, surrendered and canceled. For these bonds, furnished by A. C. James Company, held as collateral with other bonds of the debtor, the Reconstruction Finance Corporation and Railroad Credit Corporation received their allotment of new securities, 230 I. C. C. 101, as modified by the Reconstruction Finance Corporation arrangement, described in this opinion at page 485. See 233 I. C. C. 414, 452. The A. C. James Company unsecured claim against the debtor for the loan of the bonds is valueless, 233 I. C. C. 452, and the plan does not deal with any possible claim of accommodation pledgors against pledgees of bonds which were not the property of the debtor.

*Change of Conditions.* The plan now under consideration was certified to the court on September 28, 1939. To provide for a $3 dividend on the no par stock, the plan

calls for future earnings available for betterments, interest, sinking fund and dividends of over $4,500,000. The table on page 457 shows how difficult it had been for the system to earn that amount. Anticipated earnings was the principal factor governing the valuation of the property and the dollar volume of new securities, and past earnings was an important factor in estimating future earnings. A higher estimate of future earnings available for dividends might have created an equity for unsecured creditors or even stockholders. Furthermore, respondents urge that the "earning power" of the property referred to in subsection (e) means not only realized earnings but the system's ability, utilizing its present facilities to the full, to earn increased returns. This we deem of little weight against the history of past operations. Respondents ask us to take into consideration the changed conditions since the Commission acted. There are a few years of actual experience subsequent to the certification. By stipulation of the parties reports of operating results, combined, have been filed for our consideration for the period beginning December 1938 down to and including July 1942. Since we have agreement among the parties as to the earnings available for interest, as adjusted, through 1939, see page 457, *supra,* we need refer only to subsequent periods. These reports show the following sums available for interest: 1940—$2,513,090; 1941—$4,548,128; 1942 (7 months) $4,830,986,* less relatively minor deductions which have not been consistently treated in the reports. This last group of figures is utilized by us as a rough extension of the table of earnings on page 457. They are useful to show the striking increases over the old averages but have not been adjusted to conform mathematically with the table of earlier years.

---

*We have been furnished statements of operating results of the debtor through November, 1942, which show for that part of the year income available for fixed charges of $10,309,517.18.

In the interest of advancing the solution of as many problems in reorganization as possible, we have deliberated upon the effect to be given these unexpectedly large earnings. There are factors in these increased incomes which obviously affect their weight as evidence of continued capacity to produce earnings available for dividends. The effect of taxation is not wholly answered by deductions of tax estimates on the basis of present rates. The reduction by the plan of outstanding interest-bearing securities makes income taxes more likely to affect net earnings. Increased wages and costs must be reckoned with and increased maintenance may reasonably be expected from increased use. Already serious proposals for decrease of tariffs have been advanced. Order of the Interstate Commerce Commission in *Ex parte No. 148,* January 4, 1943.

Respondents, of course, admit that the needs of war have increased traffic. Transcontinental transportation has at the moment displaced a large proportion of that from coast to coast, via the Panama Canal. Buses and trucks have yielded much of their gains in volume to railroads. But respondents point to the Northern California Extension and the Dotsero Cutoff as permanent feeders to the debtor's growing business. They see a post-war reconstruction and rehabilitation period which promises a continuance of heavy railway use into the indefinite future. This, say respondents, is to be appraised in the light of the necessity for a national transportation system adequate for the productive capacity of the war facilities, when they are turned to peaceful pursuits.

The Commission, at the time of its certification to the court, September 28, 1939, acted as the results of increased business were just emerging into increased profits.[38] In

---

[38] Cf. Florida East Coast Ry. Co. Reorganization, Supplemental Report, August 10, 1942, 252 I. C. C. 731, 733:

"In the report of April 6, 1942, division 4 recognized the fact that 1941 earnings were influenced by the extraordinary conditions existing

objections to the Commission plan filed in the court on December 8, 1939, it was suggested that "any estimate of railroad earnings made prior to the development of war conditions must be revised." The court after considering all of the objections offered, but without specifically discussing the changed conditions, approved the plan on August 15, 1940. 34 F. Supp. 493, 504. The Commission's forecast was made with knowledge and not in disregard of past fluctuations of income, in war and in peace. On the showing as to changed conditions made before the District Court, there was no basis for a disapproval of the Commission plan as unfair to the junior equities. The further evidence of increased earnings, placed in the record by the stipulations, does not lead us to reject the Commission's plan.

*Effective Date of Plan.* January 1, 1939, was chosen as the effective date of the plan. The debtor objects to this on the ground that subsection (1) fixes the date of filing the petition as the date for the plan.[39] The practical result of the debtor's argument is to make the interest

---

as the result of the war and, in the report, stated fully all considerations leading to its conclusions as to justifiable amounts of capitalization and of new general-mortgage bonds. Under present conditions, the fact that the year 1942 gives promise of producing even larger earnings than 1941 affords too uncertain and precarious a basis to justify the increases sought."

Cf., also, *In re Alabama, T. & N. R. Corp.,* 47 F. Supp. 694, 708; *Akron, C. & Y. Ry. Co.* v. *Hagenbuch,* 128 F. 2d 932, 939; *Guaranty Trust Co.* v. *Minneapolis & St. Louis R.* (D. C. Minn.), September 10, 1942, Order No. 968.

[39] Section 77 (1):

"In proceedings under this section and consistent with the provisions thereof, the jurisdiction and powers of the court, the duties of the debtor and the rights and liabilities of creditors, and of all persons with respect to the debtor and its property, shall be the same as if a voluntary petition for adjudication had been filed and a decree of adjudication had been entered on the day when the debtor's petition was filed."

rate of the new securities applicable from August 2, 1935, instead of from January 1, 1939. As the new securities bear lower interest rates than the contract securities, a savings to the estate would accrue.[40] But we are of the opinion that the provisions of subsection (b) are sufficiently broad to empower the Commission to select the date for the institution of the reorganization. Cf. *Group of Institutional Investors v. Chicago, M., St. P. & P. R. Co., post,* p. 546.

*Costs.* The Institutional Bondholders Committee in No. 7 and the Trustees of the First Mortgage in No. 8 call our attention to the provision in the decree in the Circuit Court of Appeals for costs against appellees there and suggest that costs should be assessed directly against the estate of the debtor in proceedings under § 77. Our reversal of the decree leaves the appellees below free of this provision of the decree and requires us to assess costs on the review. We see also no reason why costs should not be assessed against the losing parties on this review of the action of the District Court, and it will be so ordered. This assessment is without prejudice to a motion for allowance for disbursements by respondents in accordance with subsection (c) (12).[41]

Other minor objections to the plan as approved by the District Court are advanced but we do not consider them as of sufficient weight to require comment.

From the foregoing it follows that the judgment of the Circuit Court of Appeals should be reversed and that of the District Court affirmed.

*Reversed.*

---

[40] No contention is made that fully secured claims do not bear contract interest to the date of reorganization, whenever it may be. *Ticonic Bank* v. *Sprague,* 303 U. S. 406.

[41] Cf. *Reconstruction Finance Corp.* v. *Bankers Trust Co., ante,* p. 163.

MR. JUSTICE FRANKFURTER agrees with this opinion, barring only the views expressed regarding the respective functions of the Interstate Commerce Commission and the district judge under § 77 of the Bankruptcy Act.

MR. JUSTICE JACKSON and MR. JUSTICE RUTLEDGE took no part in the consideration or decision of this case.

MR. JUSTICE ROBERTS:

I am in agreement with much that is said in the opinion, but I desire separately to state my views as to the respective roles assigned to the Interstate Commerce Commission and to the District Court in the reorganization process.

Section 77 was adopted in the exercise of the power conferred by the Constitution upon Congress to establish uniform laws on the subject of bankruptcies throughout the United States. The proceeding is, from its initiation, one in bankruptcy. The legislation constitutes the Interstate Commerce Commission an arm of the court and clothes the Commission with certain functions as such. No question is made as to the authority of Congress thus to divide responsibilities between the court and the Commission in the formulation of a plan of reorganization. Section 77 is the guide to decision concerning the respective duties of the court and the Commission. The statutory provisions quoted in Note 7 of the majority opinion seem to me clearly to define the boundaries of the powers conferred.

Certain requisites and certain permissible features of the plan, for the formulation of which the Commission has sole responsibility, are prescribed or permitted. Within very broad limits the Commission is given discretion in the application of these in formulating a plan. (Subsection (b).) When the plan is certified to the judge his function is, as the Court holds, merely to see that the

limits set in subsection (b) are not transgressed; that the Commission has observed the standards and limits thereby set. See subsection (e) which directs that the judge shall approve the plan if satisfied that it complies with the provisions of subsection (b).

Other functions are reposed solely in the Commission. It is to determine whether the plan "will be compatible with the public interest." (Subsection (d).) I need not discuss the purport of this direction, which obviously relates, in the main, to the proposed corporate and capital structure of the reorganized company. That structure must be such that the rehabilitated enterprise may have a reasonable prospect of satisfactory public service. The statute will be searched in vain for any mandate to the court to review or overturn the Commission's judgment in this respect; and I agree that the District Court properly held that the protection of the public interest was so far committed to the Commission that, except for the most egregious disregard of relevant considerations, the judge should hold himself bound by the Commission's appraisal of the demands of that interest.

Another vital step in formulating any plan is committed to the judgment of the Commission. This is valuation of property. Subsection (e) states that, if it shall be necessary to determine the value of any property for any purpose under the Act, the Commission shall determine such value and certify the same to the court in its report. It seems clear, as the opinion states, that the court cannot reject the plan for any mere asserted error in valuation. Its power is limited to an examination of the question whether the Commission acted wholly without evidence, arbitrarily, or in disregard of recognized criteria.[1]

---

[1] I believe this is so as to the valuation of all the assets and as to valuations of property subject to liens or available for the claims of classes of creditors or stockholders. See subsection (e), par. 2.

In equity reorganizations prior to the passage of § 77 the phrase "fair and equitable" had come to have a recognized content. It meant that, in allotting interests in the reorganized company, the priorities existing between lienors and stockholders of the debtor must be substantially preserved. No reorganization could be fair and equitable if, in the new capital structure, junior interests were allowed to participate at the expense of those who had had a senior position in the old.[2]

Section 77 sought to preserve and enforce this rule of law. By subsection (d) the Commission is charged with seeing that a proposed plan meets the requirements of subsection (e) and, by subsection (e) it is provided that, on certification of a plan to the court, all parties may file detailed and specific objections to the plan and their claims for equitable treatment. The judge is to hold a hearing on such objections "and such claims for equitable treatment." Thus the statute provides for the framing in court of sharp and specific issues directed to the plan's compliance with the rule governing allocation, and this fact is emphasized by the leave granted the parties to produce in court additional evidence. After the direction that the judge shall approve the plan "if satisfied" it complies with subsection (b), (which involves only a determination, as above indicated, whether the Commission, in setting up the plan, has respected the limits set by Congress in subsection (b)), subsection (e) goes on to deal with the judge's action on the objections of the parties and their claims for equitable treatment. It provides that he must be satisfied that the plan "is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in

---

[2] *Northern Pacific Ry. Co.* v. *Boyd,* 228 U. S. 482; *Case* v. *Los Angeles Lumber Co.,* 308 U. S. 106; *Consolidated Rock Products Co.* v. *Du Bois,* 312 U. S. 510.

favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders."

I read this language as placing upon the court a duty quite distinct from any imposed upon it in connection with the general features of the plan or in connection with any findings of the Commission with respect to the value of property. The statute contemplates that the judge shall not only examine the findings of the Commission with respect to the fair equivalent of what is granted to mortgagees or stockholders compared to the interest in the old company that they are to surrender, and the Commission's reasons for its action, but also hear evidence by which he may be more fully informed as to the equity and fairness, as those terms have specific legal connotation, of rights accorded under the plan in relation to those theretofore enjoyed. In my view, Congress intended that the judge should satisfy himself, as in the old equity proceedings he was bound to do, that the relation between the various classes of investors is substantially maintained in the reorganization.

In order to discharge this judicial duty the court obviously may have to pass upon questions of law. In the present case, a decision as to the priority and extent of the respective mortgage liens is a legal prerequisite to an adjudication of the issue whether different classes of mortgage bondholders received fair and equitable treatment in the apportionment of new securities. I agree with the conclusions of the court on the question of law thus presented. It happens that the parties in interest do not challenge the fairness of the allocation as between them, if the Commission was right in its tentative conclusion concerning the coverage of the first mortgage and that of the general and refunding mortgage. In this case, then, the function of the court was fully performed once

it had decided that question of law.   In other cases, where the issue of fairness and equity depends upon the facts disclosed, I think it is the duty of the court to go farther and examine the plan sufficiently to satisfy itself that the rule of absolute priority announced in the *Boyd* case and in the *Los Angeles* and *Rock Products* cases has not been violated.   In performing this duty the court should accord great weight to the Commission's action.   It should require the objector to show that the Commission has failed to respect the doctrine.   But it should not accord finality to the Commission's action if there be any evidence to support it.   I believe the court is charged by subsection (e) with the duty of determining that, in the allocation of securities in the reorganized company, the Commission has a substantial foundation in the facts for the allocation of securities required by the plan it approves.

I concur in the judgment of the Court.

MR. JUSTICE FRANKFURTER joins in this opinion.