**In re CHICAGO, R. I. & P. RY. CO.**

No. 53209.

District Court, N. D. Illinois, E. D.
May 14, 1945.

William F. Peter, Gen. Sol., of Chicago, Ill., for trustees of Chicago, R. I. & P. Ry. Co.

Henry F. Tenney, of Chicago, Ill., and John Gerdes, of New York City, for debtor.

Wilkie Bushby, of New York City, for First and Refunding bondholders.

Wright, Gordon, Zachry, Parlin & Cahill, by Daniel James, all of New York City, for Choctaw Bondholders Committee.

Wilson & McIlvaine, by S. K. Jackson, all of Chicago, Ill., for St. Louis Union Trust Co., and Protective Committee for Little Rock, Hot Springs & Western bondholders.

S. H. E. Freund, of New York City, for trustee of 4½ per cent secured bonds.

I. T. Gilruth, of Chicago, Ill., for Central Hanover Bank & Trust Co.

Winston, Strawn & Shaw, by Robert McDougal, all of Chicago, Ill., for General Mortgage Trustees and General Mortgage Committee.

Dickinson, Sprowl, Norville & James, by James A. Sprowl, all of Chicago, Ill., for Reconstruction Finance Corporation.

Harry Kirshbaum, of New York City, for Gerald Axelrod et al., Convertible bondholders.

Beekman & Bogue and Edward K. Hanlon, all of New York City, for Rock Island, Arkansas and Louisiana R. Co. Bondholders' Committee.

Charles O. Rundall, of Chicago, Ill., for Girard Trust Co.

Alexander & Green and Edward W. Bourne, all of New York City, for General Mortgage Committee.

IGOE, District Judge.

On June 25, 1943, 50 F.Supp. 835, the court entered an order referring the proceeding back to the Interstate Commerce Commission for consideration of certain matters in respect of which the court disapproved the plan of reorganization then before it. After further hearing held on September 1, 1943 the Commission, by supplemental report and order dated January 3, 1944, approved a modified plan. Various petitions for its modification were filed with

the Commission during the 60-day statutory period.

The court now has for consideration the Commission's report and order of May 1, 1944, in which said petitions are denied and the plan of January 3 is restated with some slight changes made on the Commission's own motion. Objections to the modified plan were filed by various parties and hearing thereon was held June 23, 1944.

In its prior opinion, the court stated that the question of what portion, if any, of shares of new common stock allotted to the First & Refunding bonds because of their second lien on the General Mortgage properties, should be allotted to the General Mortgage bonds in order to afford full compensatory treatment thereto, should be answered in the first instance by the Commission. The Commission has done this; it finds that the allotment of new securities by the modified plan to the General Mortgage bondholders represents the equitable equivalent of the rights surrendered by such bondholders or of any loss of seniority which may result from such allotment and that it is not necessary, in order to provide full compensation to said bondholders, that any of said shares of new common stock be allotted to them. The Commission's supplemental report of January 3, 1944 contains a full discussion and examination of the relevant facts and circumstances which it deemed essential to this determination; afterwards, it re-examined the question in the light of the General Mortgage Committee's objections to that determination, and in its supplemental report of May 1, 1944 stated the reasons for its adherence to its previously stated conclusion. The General Mortgage Committee has interposed no objections to the modified plan now before the court. Notwithstanding, the court has carefully reviewed the data upon which the Commission made its decision; believing that the Commission's finding is supported by evidence and is in accord with legal standards, the court accepts the finding that the new securities represent the equitable equivalent of the rights surrendered and considers it unnecessary to inquire whether or not under the Supreme Court's decisions in the Milwaukee [Group of Institutional Investors v. Chicago, M., St. P. & P. R. Co.,

318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959] and the Western Pacific [Ecker v. Western Pac. R. Corp., 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892] cases, the Commission's finding on this subject is binding on the court.

The modified plan provides that the appointment of members of the reorganization committee shall be subject to ratification by the court; it also fixes January 1, 1944 as the effective date of the plan in lieu of the former date, January 1, 1942. These changes are in accord with the views expressed in the court's former opinion.

The Commission's action with respect to certain other suggestions made by the court should be noticed.

### Distribution Among Creditors of Available Cash and Additional First Mortgage Bonds.

The order of June 25, 1943 required the Commission to determine the amount of cash available for distribution among creditors as of December 31, 1943. A statement submitted by the management to the Commission at the hearing on September 1, 1943 showed that after making provision for setting aside the sum of $43,373,000 as a reserve to provide for various cash requirements, the sum of $38,290,742 would be available for distribution among the debtor's creditors or for other purposes as of January 1, 1944. The modified plan provides accordingly for the distribution of $38,011,922 of cash, of which $1,762,000 represents accrued and unpaid interest to January 1, 1944, the effective date of the modified plan, on Choctaw & Memphis bonds. The remainder is to be distributed among the creditors on the basis of the relative earnings of the various mortgage properties as determined by the allocation of new securities approved in the modified plan; the amount is equivalent to 8 years' interest on the new first-mortgage bonds, 4 years' interest on the new income bonds, 2 years' dividends on the new preferred stock and a dividend of $2.50 per share on the new common stock. A total of $12,409,600 of new first-mortgage bonds (comprised of $11,000,000 originally reserved for sale or pledge to provide new money, and $1,409,600 originally allocated to Choctaw & Memphis bondholders for unpaid and ac-

crued interest instead of payment in cash as now provided) is to be distributed among the secured creditors, other than Choctaw & Memphis bondholders, by the method approved for the distribution of the other new first-mortgage bonds under the plan. This distribution of bonds and cash is acceptable to all parties in interest except the debtor and a group of Convertible bondholders.

### Objections of Debtor and of the Protective Committee for Preferred Stockholders.

The modified plan approves the total capitalization for the reorganized company of $356,117,327 (taking the new common stock at $100 a share), a decrease of $12,010,083 from the total capitalization previously approved. It is objected that this reduction is not in accord with legal standards; that there is no finding by the Commission that the assets as of January 1, 1944, the effective date of the plan, are of the value of only $356,117,327, but that the Commission made a definite finding that the capitalizable assets were of the value of $368,127,410 as of January 1, 1942, and that adding the net earnings made between January 1, 1942 and January 1, 1944 of $72,000,000, it is apparent that the value of the assets as of January 1, 1944 is $72,000,000 greater than the value as of January 1, 1942; or, if the cash distribution of $38,011,922 is taken into account, there still remains an excess of $34,000,000 over the January 1, 1942 value.

On January 1, 1942, cash on hand amounted to $16,076,185 (printed record, p. 3681). It does not appear that this sum entered into the Commission's valuation of the capitalizable assets of that date, and there is good reason for the omission, in view of the fluctuation to which this item is normally subject. But aside from that consideration, the management's statement above referred to show that after the application of $38,011,922 cash to creditors' claims, substantially all of the remaining cash on hand as of January 1, 1944 would be needed as a reserve to provide for Federal taxes for 1943, for payment of new equipment, for future replacements and improvements, and for working capital and reorganization expenses.

The Commission's report states that the decrease of $12,010,083 in total capitalization is the net result from the reduction of $13,034,916 in equipment obligations during the period January 1, 1942 to January 1, 1944, together with the net increase of $1,024,833 in new common stock, which increase was warranted by the reduction in fixed annual cash requirements of the reorganized company resulting from the reduction in the amount of equipment obligations. The larger portion of the $13,034,916 principal of equipment obligations so paid was of the Series IQ Certificates, which covered equipment acquired by the debtor at various times during the period 1920–1930. The refunding of the original equipment obligations, first in the form of Trustees' certificates of indebtedness (Order 42-K) and later by Series IQ Certificates, was dictated by the necessities of the situation and the advantages to the Trust Estate. But the court believes that the reorganized company should not be burdened with any form of capital obligations representing this equipment. The same is true as respects the other equipment obligations, except as to the certificates which remain unmatured at the consummation of the plan, the payment of which must necessarily be assumed by the reorganized company. In this connection, it may be noted that the new first mortgage and the general mortgage will contain provisions whereby additional bonds may be issued thereunder, respectively, for the acquisition of new rolling stock to the extent of 75 per cent of the net cost thereof, provided the term of said bonds shall not be more than 15 years and shall not exceed the life of the rolling stock so acquired and that a sinking fund must be created sufficient to retire the bonds within their term. These provisions, which the court believes are sound, are illustrative of the principle that equipment should not be represented, as far as it is possible to avoid so doing, by capital obligations of a permanent or long-term nature.

The court is unable to agree that there is no finding by the Commission that the capitalizable assets as of January 1, 1944 are of the value of only $356,117,327. The $24,943,916 of equipment obligations which comprised a part of the $368,127,410 total

capitalization of January 1, 1942 were to be assumed by the new company and paid on the several maturity dates, the last becoming due in 1950. No provision was made for the issuance of new securities therefor, either directly or in reimbursement of the new company's treasury. The modified plan is identical in this respect, except that it takes account of the amounts paid to the new effective date of the plan. The court finds no uncertainty in the Commission's report as to the precise factors upon which its ultimate capitalization of $356,117,327 is based.

■ The debtor further claims that the proposed distribution of an additional $12,409,600 of first-mortgage bonds to secured creditors and the proposed distribution of $38,011,922 cash among all creditors are not in accord with legal standards. The debtor claims that this distribution of securities and cash is a distribution from earnings accrued since 1942, whereas, the new securities issuable under the plan give no interest in anything which has come into existence prior to January 1, 1944. The debtor argues that such distribution implies the theory that the plan became effective as of January 1, 1936, i.e., by relation back of the 8 years' interest on the new first-mortgage bonds. But that 8 years is simply a part of the formula used to derive the fair share of each creditor; if the available fund had been larger, the period would have been larger and vice versa. As the Commission said in its report of January 3, 1944, the distribution of the available cash among the creditors simply produces a reduction of their claims. With the exception of the General Mortgage bondholders and the Choctaw & Memphis bondholders, there remains a deficiency in creditors' claims, even after the additional new securities and cash distribution. Whether the cash, both that to be distributed and that which released the additional $12,409,600 of first-mortgage bonds, was earned in whole or in part before January 1, 1942, or thereafter, is immaterial in this connection. The creditors are entitled thereto; and as their claims are still not wholly satisfied, the stockholders are not entitled to share in the distribution.

### Objections of Group of Convertible Bondholders.

Under the plan previously before the court, the holders of convertible bonds, as general creditors, were alloted 4⅓ shares of new common stock for each $1,000 of claim. This is increased to 4.967 shares, plus $12.42 cash.

The objections of this group are largely a restatement of those previously made, e.g., failure to take into account increased earnings, capital expenditures, payment of equipment obligations, cost of reproduction of the properties, issuance of new senior securities in respect of free assets, etc.

All of these matters have already received consideration by the Commission and by the court. There is no need to restate the contentions in detail or the reasons which led to their rejection.

The reduction in capitalization is objected to. The court's conclusion that the Commission's finding of a capitalizable value of $356,117,327 is based on precise factors set forth in its report and is in accordance with legal standards, has already been expressed. But even if the Commission had concluded otherwise and had left the formerly proposed capitalization of $368,127,410 unchanged, none of the $12,010,083 of additional securities would redound to the benefit of the convertible bondholders for the reason that the balance of unsatisfied claims of the secured creditors would absorb the entire amount. The additional amount of common stock and the cash which the convertible bonds receive under the modified plan, are attributable to their interest in the unmortgaged assets.

### Little Rock & Hot Springs Western Bonds.

Under the former plan, the $1,140,000 of these bonds were to receive, per $1,000 bond, $42.26 first mortgage bonds, $188.88 income mortgage bonds, $152.84 in preferred stock and $63.44 common stock. Under the modified plan, the amount of first-mortgage bonds is increased to $81.98, together with $77.11 cash. The objections are the same as those previously made, examined in detail, and rejected.

### Choctaw & Memphis Bonds.

There are two matters which require consideration: First, the application of Choctaw & Memphis bondholders for payment of interest upon matured and unpaid installments of interest on these bonds; and, second, the suggestions of Trustee Colnon that the principal of the bonds, together with unpaid interest accrued thereon at the coupon rate of 5% from January 1, 1944, and thereafter interest at the rate of 4% to a date of payment as may be fixed by the court, be paid in cash. The suggestions of the Trustee were objected to by the Committee representing the bonds of this issue.

(1) No objection is made, and none could be, to the provision of the plan that if there is a legal right to interest on interest it should be paid in cash. The question of the right to interest on interest will be treated in a separate opinion and order. See In re New York, New Haven & Hartford Railroad Co., 2 Cir., 147 F.2d 40, 53–54.

(2) The Commission's plan of July 31, 1941 provided that the lien of the Choctaw & Memphis bonds should be preserved, their interest rate reduced from 5% to 4%, and their maturity date extended from January 1, 1949 to January 1, 1969 with accrued and unpaid interest to the effective date of the plan payable in the form of an equal face amount of new first-mortgage bonds.* Considering the cash position of the debtor's estate at and prior to July 1941, and that $11,000,000 of first-mortgage bonds then had to be provided to raise new money, it is evident that the extension of Choctaw & Memphis bonds was dictated by necessity and lack of alternative. It was this plan which came before the court for hearing in October, 1941, and upon which its opinion of June 3, 1943 was rendered. The further hearing held by the Commission on September 1, 1943 was limited by it to receipt of evidence in respect of the matters specified in the court's opinion and its order of June 25, 1943. The payment of the principal of the Choctaw & Memphis bonds was not among the matters so specified. It may be fairly said, therefore, that the Commission has not considered, nor been required to consider, payment of the bonds in lieu of extending them.

The extension of maturity of these bonds for 20 years was provided to meet the then existing necessities of the case; those necessities have disappeared. Furthermore, if the plan provision were approved, the Choctaw & Memphis Bonds would not be callable before January 1, 1969. Since the Commission originally approved the proposed extension of the bonds, the market for railroad bonds has so greatly improved that there can be no doubt that the Choctaw & Memphis Bonds, bearing interest at 4%, maturing January 1, 1969 and non-callable, would sell for far more than par, and at a higher price than 5% bonds maturing January 1, 1949. In other words, the Choctaw & Memphis bondholders would benefit to a greater degree under the plan than if their legal rights remained unaffected, and such benefit would be at the cost of the reorganized company.

■■ After careful consideration, the court concludes that the proper solution is to leave the Choctaw & Memphis bonds undisturbed, not affected by the plan in any way. The holders cannot complain of this because they have no right to have their position improved by a plan of reorganization. A correction of the plan in this respect will not affect the public interest; the amount involved is so small that a maturity on January 1, 1949 will present no serious problem and their payment at such maturity will effect a substantial saving to the reorganized company in interest which would otherwise have to be paid over the extension period. The court is of the opinion that its power to make this correction in the plan is conferred by Section XXII thereof, which provides:

"XXII. Construction of Plan.

"The construction of the plan by the court shall be final and conclusive. The court may correct any defect, supply any omission, or reconcile any inconsistency in such manner and to such extent as may be necessary or expedient in order to carry out the plan effectively."

---

* By supplemental order dated January 3, 1944, the Commission modified the plan so as to provide for the payment of accrued and unpaid interest on these bonds in cash.

The foregoing conclusions make it unnecessary to consider the question as to the power of the court to order immediate payment of these bonds or to pass on the objections thereto made by the holders.

### Miscellaneous.

The Commission has made certain changes and corrections in the plan on its own motion. No objection has been made to any of these. The court has examined them and finds that they are proper and should be approved.

By order entered November 8, 1944 on the petition of the Trustees, the court directed the Trustees to pay the claim of Reconstruction Finance Corporation with interest at the rate of 4%. Such payment will result in the return of the collateral held by the RFC and the withholding of the cash and securities allotted to it under the plan. At the hearing on said petition, it was contended by certain objectors that the payment might be urged as the basis for a redistribution of such cash and securities so allotted.

The court holds that, if the claim of the Reconstruction Finance Corporation is paid, or if any other claims or bonds are paid or purchased, there is to be no redistribution of securities, and any securities released from pledge or purchased or paid, and any new securities issued therefor under the plan, would be treasury securities. The court so construes the plan under Section XXII, which has already been quoted, and under Section XVII, "Payments on Claims before Plan Consummated," which provides that in the event any payment shall be made in respect of a claim prior to the consummation of the plan, securities otherwise distributable in respect of such claim shall be withheld and shall be treasury securities.

The court considers the payment of the claim of the Reconstruction Finance Corporation, or the payment or purchase of other claims or bonds, if any be ordered, to be consistent with the plan and to afford no basis for any redistribution of securities which would involve a modification of the plan. If any money used to pay or purchase a claim or bonds were not used in that way, it could be used, either before or after consummation of the plan, for additions and betterments or for the purchase of equipment, and it could be used after the consummation of the plan for the purchase of the securities allotted under the plan for the claims of bonds. It is no more inconsistent with the plan to pay claims or purchase securities before the consummation of the plan than it is to spend the same money for additions and betterments before or after the consummation of the plan, or to purchase securities after the plan is consummated.

Clearly the payment of a claim or the purchase of securities would not afford a basis for a redistribution of securities allotted under the plan. It would amount merely to appropriating surplus earned since the effective date of the plan to one of the several uses to which it could be applied. All those who have interests, as stockholders of the reorganized company in the earned surplus would benefit from such a use of the money consistently with the plan, just as they would if the money were spent for additions and betterments or used after the consummation of the plan to purchase securities. If there were a redistribution of the securities that would not be true.

The use of the money will not constitute a change in conditions calling for a modification of the plan. The money has accumulated, and there is no basis for saying that there is more in the estate than was expected when the Commission approved the plan. The use of the money to retire debt does not change the situation any more materially than would the use of it for additions and betterments or the accumulation of it for future use.

### Conclusions.

With the corrections and clarifications hereinbefore set forth, the court concludes and finds that the provisions of the modified plan now before it comply with subsection b of section 77 of the Bankruptcy Act, 11 U.S.C.A. § 207, sub. b, that the plan is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land regarding the participation of the various classes of

554

creditors and stockholders; that the approximate amounts to be paid by the debtor, or by any corporation or corporations acquiring the assets of the several debtors herein, for expenses and fees incident to the reorganization, have been fully disclosed so far as they could be ascertained at the date of the hearing, are reasonable, are within such maximum limits as are fixed by the Commission and are, within such maximum limits, subject to the approval of the court, which approval has been given by various orders heretofore entered in these proceedings; that the plan provides for the payment of all costs of administration and all other allowances made or to be made by the court; and that all of the statutory prerequisites to the approval of the plan as certified to the court by the Interstate Commerce Commission have been met.

For the reasons heretofore given, all objections to said modified plan will be overruled, and the plan, as herein corrected and clarified, will be approved.

Counsel for the Trustees are requested to prepare an appropriate draft of decree in conformity with this opinion and to submit the same to the court upon not less than 10 days' notice to all parties entitled thereto.